# No. 24-40421

---

In the
## U.S. COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

Joshua Yarbough; Matt Lofland; Lee Green; Sterling Vicks; Joshua Walker;
Michael Brown; Adawale Ashiru; Paul Tijani; Peter Tijani; Brandon Price;
Harom Pringle; Osasu Saigheyisi; Brett Samuels; and Rukeve Ologban,

*Appellants,*

v.

CSS Corp., and Glow Networks, Inc.,

*Appellees.*

---

Appeal from the United States District Court for the
Eastern District of Texas, Sherman Division
District court Cause No. 4:19-cv-905
The Honorable Sean D. Jordan, Presiding

# APPELLANTS' BRIEF

**Brian Sanford**
Texas Bar No. 17630700
bsanford@sanfordfirm.com
**Elizabeth "BB" Sanford**
Texas Bar No. 24100618
esanford@sanfordfirm.com
THE SANFORD FIRM
1910 Pacific Avenue
Suite 15400
Dallas, Texas 75201
(214) 717-6653 (telephone)
(214) 919-0113 (fax)

**Haleigh Jones**
Texas Bar No. 24097899
hjones@cwl.law
**Dallas Flick**
Texas Bar No. 24104675
dflick@cwl.law
CRAWFORD, WISHNEW &
LANG PLLC
1700 Pacific Avenue
Dallas, Texas 75201
(214) 817-4500 (telephone)

*Attorneys for Appellants*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-40421

Yarbrough, et al. v. SlashSupport, Inc. and Glow Networks, Inc.

The undersigned counsel of record certifies that the following listed per sons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

> Joshua Yarbough; Matt Lofland; Lee Green; Sterling Vicks; Joshua Walker; Michael Brown; Adawale Ashiru; Paul Tijani; Peter Tijani; Brandon Price; Harom Pringle; Osasu Saigheyisi; Brett Samuels; and Rukeve Ologban, Appellants;
>
> Brian P. Sanford, Attorney for Appellant;
>
> Elizabeth (BB) Sanford, Attorney for Appellant;
>
> Haleigh Jones, Attorney for Appellant;
>
> Dallas Flick, Attorney for Appellant;
>
> SlashSupport, Inc.,[1] and Glow Networks, Inc., Appellees;
>
> Charles Frazier, Attorney for the Appellee;
>
> David O'Toole, Attorney for the Appellee; and

---

[1] While SlashSupport is not listed on the case caption, it is part of an integrated enterprise with Glow; and, therefore, is liable. This issue is the subject of Plaintiffs' appeal of one of the district court's two Rule 50(a) orders.

Rachel Z. Ullrich, Attorney for the Appellee.

## STATEMENT REGARDING ORAL ARGUMENT

This case involves public policy issues related to the enforcement of the Civil Rights Act of 1866. A jury found that an employer discriminated and retaliated against nine Black engineers, and one white engineer who opposed the treatment, awarding each seven million dollars. Oral argument will aid in resolving whether proof of pretext and a prima facie case under McDonnell Douglas, added to the totality of facts, including red flags of discrimination and retaliation and a human resource senior manager's statement to "not lay off any white people," sufficiently supports the jury's verdict.

TABLE OF CONTENTS.................................................................iv

TABLE OF AUTHORITIES...........................................................vii

STATEMENT OF JURISDICTION ...............................................xvi

STATEMENT OF THE ISSUES ...................................................xviii

STATEMENT OF CASE...................................................................1

SUMMARY OF THE ARGUMENT .................................................5

STANDARDS OF REVIEW ...........................................................8

ARGUMENT..................................................................................10

    I.  The lower court dismissed race discrimination and retaliation claims of Green, Vicks, Price, Ologban, and Samuels because they could not show constructive discharge—a showing no longer required since the Court's ruling in *Hamilton.*...................10

    II. The district court erred in granting judgment as a matter of law for Defendants pursuant to Rule 50(b), and this Court should reinstate the jury's verdict for Plaintiffs; or, alternatively, remit the verdict......................................17

        A. The district court eliminated the consideration of a statement of racist intent .........................................18

        B. The district court improperly determined Plaintiffs' only evidence was their feelings, thoughts, and beliefs....................20

        C. The district court misapplied McDonnell Douglas ...................21

            1. Plaintiffs provided evidence at trial supporting the proof recognized by McDonnell Douglas .........................21

                a. The Prima Facie Case.................................................21

                b. Defendants' Pretext ....................................................22

2. An Employer's Subjective Reason Is Inappropriate.......23

3. The District Court's Misapplication of McDonnell Douglas...............................................................24

   a. Discrimination Does Not Have to Be Against All .......24

   b. Proof of the Prima Facie Case Plus the Falsity of the Employer's Reason Satisfies "Because of Race."............................................................31

   c. Failure to Provide a Reason for the Different Treatment.....................................................34

D. The district court erroneously held that discriminatory acts were insufficiently severe to constitute an adverse employment action.....................................................37

E. The district court reweighed the evidence, contrary to the JMOL standard...........................................................38

F. The district court failed to account for the cumulative weight of the evidence ...............................................39

G. The jury's retaliation verdicts are supported by the evidence......................................................................41

   1. Sufficient evidence supports the jury's conclusion that Defendants retaliated against Lofland and Paul Tijani for opposing racial discrimination.........................41

H. The jury's verdict that Glow retaliated against Aigheyisi and Peter Tijani is not against the great weight of the evidence......................................................................43

I. The Verdict Was not the Result of Unfair Passion or Prejudice ...................................................................44

J. Identical compensation awards were not excessive..................46

K. Evidence of Mental Anguish.....................................................47

L. The jury's award of punitive damages was not excessive......... 60

    1. Reprehensibility or culpability.........................62

    2. The relationship between the penalty and the harm ......63

    3. The sanctions imposed in other cases for comparable misconduct .......................................................63

III. The district court erred in granting judgment as a matter of law pursuant to Rule 50(a) as to Yarbrough's and Lofland's constructive discharge claims, and this Court should reinstate the jury's verdict for Plaintiffs; or, alternatively, remit the verdict...........................................................64

IV. Alternatively, this Court should remand for a new trial. ...........69

    A. This Court should reverse the district court's summary judgments against Plaintiffs on their hostile work environment claims and allow them to try those claims on remand. ....................................................69

        1. Element three – Plaintiffs offered evidence that created a genuine issue of material fact regarding harassment based on race ...............................70

        2. Element four – Plaintiffs offered evidence that creates a genuine issue of material fact regarding harassment that affected a term, condition, or privilege of employment ...................................83

    B. This Court should reverse the district court's Rule 50(a) order and allow Plaintiffs to try their claims against SlashSupport on remand because it and Glow are an integrated enterprise.................................................93

    C. This Court should reverse the district court's exclusion of "me-too" evidence as cumulative ...............................98

CONCLUSION AND PRAYER.......................................................100

Cases

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ............................................................45

*Alaniz v. Zamora-Quezada*,
591 F.3d 761 (5th Cir. 2009) ...........................................99

*Baker v. Bd. of Regents of State of Kan.*,
991 F.2d 628 (10th Cir. 1993) .........................................47

*Bauer v. Albemarle Corp.*,
169 F.3d 962 (5th Cir. 1999) ...........................................21

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ...........................................................61

*Bocanegra v. Vicmar Servs., Inc.*,
320 F.3d 581 (5th Cir. 2003) ...........................................10

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) ...................................................24, 33

*Bray v. Marriott Hotels*,
110 F.3d 986 (3d Cir. 1997)..............................................39

*Brennan's Inc. v. Dickie Brennan & Co.*,
376 F.3d 356 (5th Cir. 2004) .......................................9, 38

*Brewer v. Williams*,
430 U.S. 387 (1977) ...........................................................21

*Chance v. Bd. of Examiners & Bd. of Ed. of City of New York*,
534 F.2d 993 (2d Cir. 1976), opinion modified on reh'g sub
nom. *Chance v. Bd. of Examiners & the Bd. of Educ. of the City of
New York*, No. 75-7161, 1976 WL 13310 (2d Cir. May 17, 1976) .......45

*City of Ontario, Cal. v. Quon,*
  560 U.S. 746 (2010). .............................................................. 80

*Clark v. EPCO Inc.,*
  376 Fed. Appx. 427 (5th Cir. 2010) ...................................... 8

*Connecticut v Teal,*
  457 U.S. 440 (1982) ............................................................ 28

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,*
  532 U.S. 424 (2001) ............................................................ 61

*Crawford v. W. Elec. Co., Inc.,*
  614 F.2d 1300 (5th Cir. 1980) ............................................. 23

*Cty. of L.A., Dep't of Water & Power v. Manhart,*
  435 U.S. 702 (1978) ............................................................ 25

*Danville v. Reg'l Lab Corp.,*
  292 F.3d 1246 (10th Cir. 2002) ........................................... 22

*David Duval v. Novant Health, Inc.,*
  No. 3:19-CV-624-DSC (W.D. N.C.) (case pending) .............. 63

*Dediol v. Best Chevrolet, Inc.,*
  655 F.3d 435 (5th Cir. 2011) ................................... 64, 65, 67

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,*
  188 F.3d 278 (5th Cir. 1999) ............................................... 13

*Diaz v. Kraft Foods Global, Inc.,*
  653 F.3d 582 (7th Cir. 2011) ............................................... 28

*Diaz v. Tesla, Inc.,*
  No. 3:17-CV-06748-WHO, 2022 WL 1105075
  (N.D. Cal. Apr. 13, 2022) .................................................... 63

*Dotson v. City of Indianola, Miss.*,
  739 F.2d 1022 (5th Cir. 1984) ............................................. 45

*Edwards v. Aaron Rents, Inc.*,
  482 F. Supp. 2d 803 (W.D. Tex. 2006) ................................. 63

*EEOC v. WC&M Enters., Inc.*,
  496 F.3d 398 (5th Cir. 2007) ............................................. 72

*Ellison v. Brady*,
  924 F.2d 872 (9th Cir. 1991) ............................................. 84

*Finch v. United States*,
  433 U.S. 676 (2009) ....................................................... 20

*Fitzpatrick v. Pontotoc Cnty., Miss.*,
  612 Fed. Appx. 770 (5th Cir. 2015) .................................... 28

*Foster v. Univ. of Maryland-E. Shore*,
  787 F.3d 243 (4th Cir. 2015) ............................................ 32

*Furnco Const. Corp. v. Waters*,
  438 U.S. 567 (1978) .................................................. 24, 28

*Garcia v. Prof'l Contract Services, Inc.*,
  938 F.3d 236 (5th Cir. 2019 ............................................. 32

*Goldstine v. FedEx Freight Inc.*,
  No. C18-1164 MJP, 2021 WL 952354
  (W.D. Wash. Mar. 11, 2021) ............................................. 63

*Goodman v. Lukens Steel Co.*,
  482 U.S. 656 (1987) ....................................................... 47

*Goudeau v. Nat'l Oilwell Varco, L.P.*,
  793 F.3d 470 (5th Cir. 2015) ............................................ 20

*Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*,
  560 F. App'x 328 (5th Cir. 2014) .......................................................... 10

*Hamilton v. Dallas County*,
  79 F.4th 494 (5th Cir. 2023)..................................................... 6, 11, 12

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ................................................................ 84, 85, 91

*Harvill v. Westward Commc'ns, LLC*,
  433 F.3d 428 (5th Cir. 2005) .......................................................... 83

*Haun v. Ideal Industries, Inc.*,
  81 F.3d 541 (5th Cir. 1996) ............................................................ 28

*Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*,
  850 F.3d 731 (5th Cir. 2017) ..................................................... 28, 73

*Hill v. International Paper Co.*,
  121 F.3d 168 (5th Cir. 1997) ........................................................... 13

*Hiltgen v. Sumrall*,
  47 F.3d 695 (5th Cir. 1995) ..................................................... 9, 36, 38

*Hitt v. Connell*,
  301 F.3d 240 (5th Cir. 2002) ........................................................... 99

*J.A. Masters Investments v. Beltramini*,
  117 F.4th 321 (5th Cir. 2024) .......................................................... 21

*Jenkins v. Nell*,
  26 F.4th 1243 (11th Cir. 2022) ........................................................ 40

*Jiang v. Tex. Comm'n on Envtl. Quality*,
  321 F. Supp. 3d 738 (W.D. Tex. 2018) .............................................. 33

*Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant*,
  491 F.2d 1364 (5th Cir. 1974) ......................................................... 45

*Johnson v. Halstead*,
   916 F.3d 410 (5th Cir. 2019) ........................................................ 12, 81

*Johnson-Lee v. Tex. A&M Univ.-Corpus Christi*,
   No. 2:23-CV-00229, 2024 WL 3196764 (S.D. Tex. Apr. 11, 2024) ....... 11

*Jones v. Overnite Transportation*,
   212 F.App'x 268 (5th Cir. 2006) .......................................................... 18

*Jones v. Robinson Prop. Group. L.P.*,
   427 F.3d 987 (5th Cir. 2005) ............................................................... 19

*Jurgens v. EEOC*,
   903 F.2d 386 (5th Cir. 1990) ............................................................... 68

*Lewis v. Pugh*,
   289 F. App'x 767 (5th Cir. 2008) ........................................................ 61

*Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*,
   9 F.4th 317 (5th Cir. 2021) ................................................................. 22

*Long v. Faenas Transp., L.L.C.*,
   No. 21-40268, 2021 WL 5119717 (5th Cir. Nov. 3, 2021) ................... 44

*Luna v. Corr. Corp. of Am.*,
   469 F. App'x 301 (5th Cir. 2012) ........................................................ 39

*Lyons v. Katy Indep. Sch. Dist.*,
   964 F.3d 298 (5th Cir. 2020) ............................................................... 43

*Martin v. Winn-Dixie Louisiana, Inc.*,
   132 F. Supp. 3d 794 (M.D. La. 2015) ................................................... 40

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................... 9

*Mayberry v. United States*,
   151 F.3d 855 (8th Cir. 1998) ............................................................. 47

*Mays v. Chevron Pipe Line Co.*,
   968 F.3d 442 (5th Cir. 2020) ................................................................ 9

*McDonnell Douglas v. Green*,
   411 U.S. 792 (1973) ........................................................................... 32

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
   934 F.3d 447 (5th Cir. 2019) ............................................................. 20

*Medina v. Ramsey Steel Co., Inc.*,
   238 F.3d 674 (5th Cir. 2001) ............................................................. 23

*Migis v. Pearle Vision, Inc.*,
   135 F.3d 1041 (5th Cir. 1998) ........................................................... 47

*Monroe v. Columbia Coll. Chicago*,
   990 F.3d 1098  (7th Cir. 2021), reh'g denied (Apr. 12, 2021) ............. 47

*Morrison v. Dallas Cnty. Cmty. Coll.*,
   273 F. App'x 407 (5th Cir. 2008) ....................................................... 42

*Muldrow v. City of St. Louis*,
   601 U.S. 346 (2024) ..................................................................... 18, 37

*Nat'l Ass'n of African Am.-Owned Media*,
   589 U.S. 327 (2020) ............................................................................. 5

*Oden v. Oktibbeha County, Miss.*,
   246 F.3d 458 (5th Cir. 2001) ............................................................. 47

*Oncale v. Sundowner Offshore Servs. Inc.*,
   523 U.S. 75 (1998) ....................................................................... 72, 84

*Owens v. Circassia Pharms., Inc.*,
   33 F.4th 814 (5th Cir. 2022) ............................................................. 22

*Palasota v. Haggar Clothing Co.*,
  342 F.3d 569 (5th Cir. 2003) .......................................... 19, 23

*Perry v. VHS San Antonio Partners, L.L.C.*,
  990 F.3d 918 (5th Cir. 2021) ............................................... 94

*Peterson v. Linear Controls Inc.*,
  757 Fed. Appx. 370 (5th Cir. 2019) ..................................... 12

*Pfau v. Mnunchin*,
  No. 1:18-CV-422-RP, 2019 WL 2124673, at *1
  (W.D. Tex. May 15, 2019) ..................................................... 88

*Pfeil v. Intercom Telecommunications*,
  90 F.Supp.2d 742 (N.D. Tex. 2000) ..................................... 83

*Pickney v. Diamond Offshore Services Ltd.*,
  No. CV H-18-4545, 2022 WL 889035, at *10
  (S.D. Tex. Mar. 25, 2022) ..................................................... 99

*Pitre v. W. Elec. Co.*,
  843 F.2d 1262 (10th Cir. 1988) ........................................... 28

*Pouncy v. Prudential Ins. Co. of Am.*,
  668 F.2d 795 (5th Cir. 1982) ............................................... 31

*Ramsey v. Henderson*,
  286 F.3d 264 (5th Cir. 2002) .......................................... 79, 81

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000). ................................................. 8, 26, 31

*Reilly v. TXU Corp.*,
  271 F. App'x 375 (5th Cir. 2008) ......................................... 19

*Rosebud Sioux Tribe v. Kneip*,
  430 U.S. 584 (1977) ........................................................... 20

*Russell v. McKinney Hosp. Venture,*
   235 F.3d 219 (5th Cir. 2000) ............................................................. 28

*Saketkoo v. Administrators of Tulane Educ. Fund,*
   31 F.4th 990 (5th Cir. 2022) ............................................................. 72

*Scales v. Slater,*
   181 F.3d 703 (5th Cir. 1999) ............................................................. 72

*Shepherd v. Comptroller of Public Accounts,*
   168 F.3d 871 (5th Cir.1999) ............................................................. 83

*Shiyan Jiang v. Tex. Comm'n on Envtl. Quality,*
   321 F. Supp. 3d 738 (W.D. Tex. 2018) ............................................... 69

*Smith v. City of Seven Points, Tex.,*
   608 F. Supp. 458 (E.D. Tex. 1985) .................................................... 60

*Spiller v. Harris Cnty., Tex.,*
   113 F.4th 573 (5th Cir. 2024) ............................................................ 21

*Sprint/United Management Co. v. Mendelsohn,*
   522 U.S. 379 (2008) ......................................................................... 40

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408 (2003) ......................................................................... 61

*Stennett v. Tupelo Pub. Sch. Dist.,*
   619 Fed. Appx. 310 (5th Cir. 2015) ................................................... 22

*Stephens v. C.I.T. Grp./Equip. Fin., Inc.,*
   955 F.2d 1023 (5th Cir. 1992) ............................................... 65, 68, 69

*Tex. Dep't of Cmty. Affairs v. Burdine,*
   450 U.S. 248 (1981) ......................................................................... 23

*Tompkins v. Cyr,*
   202 F.3d 770 (5th Cir. 2000) .............................................................. 9

*Trevino v. Celanese Corp.*,
701 F.2d 397 (5th Cir. 1983) ........................................................ 94, 97

*Troupe v. May Dep't Stores Co.*,
20 F.3d 734(7th Cir.1994) .................................................................. 40

*United States v. Burke*,
504 U.S. 229 (1992) ............................................................................ 46

*W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*,
11 F.3d 65 (5th Cir. 1994) ................................................................. 96

*Walther v. Lone Star Gas Co.*,
952 F.2d 119 (5th Cir. 1992) ............................................................. 28

*Wantou v. Wal-Mart Stores Tex., L.L.C.*,
23 F.4th 422 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 745 (2023)........ 83

*Watkins v. Tregre*,
997 F.3d 275 (5th Cir. 2021) ............................................................. 10

*Weller v. Citation Oil & Gas Corp.*,
84 F.3d 191 (5th Cir. 1996) ............................................................... 11

*Woods v. Cantrell*,
29 F.4th 284 (5th Cir. 2022)........................................................ 83, 84

*Young v. United Parcel Serv., Inc.*,
575 U.S. 206 (2015) ........................................................................... 34

## Statutes

42. U.S.C.§ 1981 ..................................................................................... 81

Fed. R. Evid. 401 .................................................................................... 95

## Other Authorities

https://www.merriam-webster.com/dictionary/humiliate .................... 104

# STATEMENT OF JURISDICTION

## TO THE HONORABLE FIFTH CIRCUIT COURT OF APPEALS:

Joshua Yarbough; Matt Lofland; Lee Green; Sterling Vicks; Joshua Walker; Michael Brown; Adawale Ashiru; Paul Tijani; Peter Tijani; Brandon Price; Harom Pringle; Osasu Saigheyisi; Brett Samuels; and Rukeve Ologban; Appellants ("Plaintiffs,") submit this brief on appeal from the orders and a judgment of the United States District Court for the Eastern District of Texas, Sherman Division.

### A.     Subject Matter Jurisdiction in the District Court.

The U.S. District Court for the Eastern District of Texas had subject-matter jurisdiction because Plaintiffs' claims, which arise under 42 U.S.C. § 1981, present federal questions. *See* 28 U.S.C. § 1331.

### B.     Jurisdiction in the Court of Appeals.

Fourteen plaintiffs appeal the district court's (1) order granting a partial motion for summary judgment by appellees; (2) order granting a Rule 50(b) motion by appellees; (3) two orders granting Rule 50(a)

motions by appellees, and (4) the final judgment dismissing Plaintiffs' claims.[2] The district court:

- rendered partial summary judgment on February 2, 2022 (RE.4; ROA.1129-58);

- signed the Rule 50(b) order on March 1, 2024 (RE.7; ROA.2390-2474);

- signed the Rule 50(a) orders on February 16, 2022 (RE.5; ROA.1271-72) and February 17, 2022 (RE.6 ROA.1370-82);

- and rendered the final judgment on May 15, 2024. RE.9; ROA.2499-2505.

The judgment is final. Plaintiffs filed a timely notice of appeal on June 7, 2024. RE.2; ROA.2506-07). This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

---

[2] Plaintiffs also challenge exclusion of witness testimony. RE.8 ROA.3598-60,4134-55.

## STATEMENT OF THE ISSUES

**Reinstatement of the Verdict —**

1. At trial, the plaintiffs presented evidence of the prima facie case and pretext under McDonnell Douglas. In presenting evidence of pretext, Plaintiffs rebutted the employer's reasons for the adverse actions and showed red flags of discrimination and retaliation. The evidence also included a human resource senior manager saying, "Don't lay off any white people." Did the district court properly disregard this evidence in granting a judgment notwithstanding the verdict?

2. To prove constructive discharge, a plaintiff must "show that 'a reasonable party in his shoes would have felt compelled to resign.'" Plaintiffs Yarbrough and Lofland showed Defendants demoted them, reduced their work responsibilities, and threatened to fire them when they made no mistakes. Was the evidence legally sufficient for a jury to find they were constructively discharged following their demotion?

3. The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the Defendants' conduct. Defendants intentionally and recklessly violated the law by treating Black employees worse than others, including surveillance, false accusations, demotions, terminations, and instructing its employees "not to lay off any white people." The jury punished Defendants for discrimination and retaliation, which were the only business practices discussed at trial. The punitive damages were comparable to those awarded in other discrimination and retaliation cases. Was the punitive damages award excessive?

**Summary Judgment Reversal —**

4. Did the district court err in granting summary judgment against (1) the race discrimination claims of Green, Vicks, Samuels, and

Ologban; and (2) the race discrimination claim of Price predicated on his 2019 termination?

    a. The trial court required Plaintiffs to show constructive discharge to establish they suffered an adverse employment action and maintain their race discrimination claims. Since that ruling, this Court held in *Hamilton* that Plaintiffs' must only show discrimination in hiring, firing, compensation, or in the "terms, conditions, or privileges" of employment to establish they suffered an adverse employment action. Held to that standard, can Plaintiffs show they suffered an adverse employment action?

## Alternative Request for New Trial —

Appellants request the Court reach the following issues in event it remands this cause for a new trial:

5. Should this Court reverse the district court's dismissal of Plaintiffs' hostile work environment claims by summary judgment and allow Plaintiffs to try those claims on remand?

    a. Plaintiffs must show the harassment was based on Plaintiffs' membership in a protected class. Plaintiffs offered evidence that Defendants (i) denied Black workers privileges afforded other races; (ii) surveilled Black workers (iii) screamed at, threatened, and intimated Black workers; and (iv) demoted Black workers while promoting less qualified white and Indian workers. Did Plaintiffs raise a genuine issue of material fact regarding whether the treatment was based on their race?

    b. Plaintiffs must show the harassment affected a term, condition, or privilege of their employment. Plaintiffs showed they were denied the same privileges as white employees, were threatened, screamed at, and unfairly reprimanded, were required to do dishes and chauffer other workers, were denied permission to wear native Nigerian dress when others (Muslims) were permitted, and were disproportionately recorded on cameras. Did Plaintiffs raise a genuine issue of material fact regarding

whether the harassment affected a term, condition, or privilege of their employment?

6. Distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise. Whether the entities share a centralized control of labor relations is the most important consideration. Plaintiffs introduced substantial evidence showing that SlashSupport (CSS) required Glow to use its email domain, policies, and benefits, and controlled Glow's labor relations issues. Should this Court reverse the district court's dismissal of claims against SlashSupport (CSS), find it is an integrated enterprise with Glow, and allow Plaintiffs to recover against SlashSupport (CSS) on remand?

7. Plaintiffs offered four witnesses' testimony in support of their retaliation claims for two purposes: (1) as evidence of the witnesses' observations of Defendants' treatment of Plaintiffs; and (2) as evidence that Defendants treated the witnesses like they treated Plaintiffs. Courts allow such "me-too" testimony because it presents a different perspective than that offered by the plaintiff. Did the trial court abuse its discretion in excluding the evidence as cumulative and may Plaintiffs present that evidence on remand?

## A. Defendants CSS and Glow and their operations.

Defendants CSS Corp. (SlashSupport) (identified herein as "CSS") and Glow Networks ("Glow") were interrelated entities. ROA.3211-12. CSS's and Glow Networks' headquarters are located in India. ROA.3207. They share the same benefits, handbooks, guidelines, and policies. ROA.3211. CSS acquired Glow, required all email addresses to be changed to CSS addresses, assumed control over Glow's Richardson, Texas office, and employed the human resource personnel overseeing Glow. ROA.3154-55, 3212. To resolve confusion over CSS's identity, the parties stipulated during trial that SlashSupport, Inc. would be the entity identified each time CSS Corp. was referenced. ROA.1213-14.

Defendants hired Tier 1 and Tier 2 engineers to assist in migrating sites from 4G to 5G for telephone companies such as Verizon and Nokia. ROA.3302. Ninety percent of Tier 1 employees were Black, and Tier 2 engineers were predominately Indian and white. ROA.3308. Managers were white and Indian. ROA.3308. Tier 1 engineers were assigned to communicate with a field technician, and Tier 2 engineers provided next-level support. ROA.2840.

Defendants' engineers reported to Sandeep Pauddar, the project manager. ROA.2845. Mohammad Silat was a team lead. ROA.2845. Debbie Cahoon is an HR manager. ROA.2845. LaTorey Malone was an HR employee. ROA.2845. The C-Suite employees, Defendants' upper management, were all of Indian descent. ROA.2846.

## B. Defendants' discrimination and disparate treatment of Black employees.

Defendants created a harmful workplace environment designed to discriminate against Black employees. Defendants did not follow policy, procedures, and normal human resource standards, and they failed to monitor, supervise, and enforce the law to protect employees in the workplace, including Black employees. ROA.2769, 2776-77. Defendants specifically refused to follow its disciplinary policies equally (ROA.2956), and they frequently engaged in a variety of disparate treatment:

- Defendants allowed employees to put their feet on their desks—except for Black employees. ROA.2956-57.

- White and Indian workers were not assigned as many worksites as some Black employees. ROA.3270-71.

- Defendants monitored how long Black employees would be on breaks and what they were doing on breaks. ROA.2956, 3272. Meanwhile, Indian employees were allowed to have long breaks without anyone monitoring their conduct. *Id.*

- Defendants treated Black employees differently regarding dress code—they only allowed non-Black employees to wear sweatpants, athleisure, or clothing tied to their respective nationalities or culture. ROA.2957-60; 3319-20.

- Defendants treated the Black employees differently regarding cell phone usage. ROA.2960-61.

- Supervisors would help a white or Indian employees upon request, but not Black employees. ROA.3270.

Over time, Defendants created a race-based caste system to the detriment of its Black employees. Upper management were all of Indian culture (ROA.2966-67), middle managers included white employees (ROA.2967-68), and most lower-level employees were Black workers. ROA.2969. And while Defendants promoted Indians employees, they frequently ignored Black employees who were often more experienced and more capable. ROA.2860-62, 2963. Defendants do not dispute that the engineers were qualified yet chose to disregard them when it mattered most. ROA.3179-80.

## C. In response to employee complaints about discriminatory conduct, Defendants began to retaliate.

When Black employees began to confront Defendants for their discriminatory conduct, Defendants began their retaliation campaign. *Id.* Several Black employees began a petition because of Defendants' unfair treatment. ROA.2863. Defendants learned of the petition and said

that anyone who participates will be fired on the spot. *Id.* They then began to target Black workers they believed were involved with the petition, including certain Plaintiffs. ROA.2865-66.

Defendants then proceed to lay off employees. Over half of the Black employees were listed in Defendants' original layoff list, while less than ten percent of Asian employes were listed. ROA.3184-86, P. Ex. 24. HR recognized the disparity, yet said in the meantime, "Don't lay off any white people." ROA.2872. The final list, although a little more even ethnically, does not account for demotions and those who quit or were fired. ROA.3187-88. Defendants have projects that come and go, with Defendants winding up and winding down. ROA.3188. Only Asian employees were brought back from the layoff. ROA.3189.

Defendants have since acknowledged that discriminatory red flags include discrepancies in pay and promotions, complaints, harassment, surveillance of Black employees, unequally enforced rules concerning breaks and use of personal phones, disparate training, unequal credit for the work performed by Black and non-Black workers, and in discipline and termination of Black and non-Black employees. ROA.3214; 3216; 3220-23. Nevertheless, Defendants insist that Plaintiffs' contentions and

supporting testimony are based solely on opinion and not fact. But Plaintiffs frequently observed Defendants targeting Black employees and witnessed how every time one or more Plaintiffs brought the issues to Defendants' attention, Defendants would only retaliation and seek to terminate those reporting the issues. ROA.2916. Defendants stopped at nothing to protect their caste system.

## SUMMARY OF THE ARGUMENT

"Don't lay off any white people." That direction came from Deborah Cahoon, CSS's Human Resources Director. Stated in the negative, she instructed, "only lay off people who are not white." Racism permeated Defendants' business practices. Evidence presented at trial demonstrated that CSS imposed a caste system. At the top was the Indian leadership, followed by white employees, Hispanic employees, and Black workers at the bottom.

Congress passed the Civil Rights Act of 1866 in the aftermath of the Civil War to vindicate the rights of former slaves. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020). Similar to the Civil Rights Act of 1866, "Congress enacted the Civil Rights Act of 1964 to protect every American against every form of

prohibited discrimination—not just certain favored classes against certain disfavored forms of discrimination." *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 509 (5th Cir. 2023) (J. Ho) (concurring). The district court's decisions—rendered notwithstanding the jury's $70 million dollar verdict for ten Plaintiffs—are examples of overly restrictive barriers to these laws.

The Court should reverse the district court's grant of Defendants' motion for summary judgment. First, Plaintiffs presented evidence of Defendants' conduct that showed a pattern of harassment of Black workers sufficient to create a fact question on the existence of a hostile work environment. That conduct, taken together, depicted a pervasive work culture that was both severe and frequent enough to materially affect Plaintiffs' employment and result in their undue humiliation and harm. Second, the lower court erred by dismissing certain of Plaintiffs' race discrimination and retaliation claims based on a lack of showing of constructive discharge. But the Fifth Circuit has since held that plaintiffs need only allege facts showing discrimination in the "terms, conditions, or privileges" of their employment—a burden Plaintiffs met.

Next, the Court should reverse the district court's grant of Defendants' renewed motion for judgment as a matter of law under Rule 50(b). The district court incorrectly disregarded Plaintiffs' common evidence of discrimination and retaliation and their subjective belief evidence concerning the same, choosing instead to embrace Defendants' excuses of tokenism that the jury rejected in reaching its verdict. The district court also incorrectly ignored the McDonnell Douglas inference, upon which a jury may rely to find that Plaintiffs established a prima facie case of Defendants' discriminatory and retaliatory conduct.

Further, the Court should reverse the district court's grant of Defendants' motion for judgment as a matter of law under Rule 50(a) as to Yarbrough's and Lofland's constructive discharge claims. Both Plaintiffs presented evidence of their demotion, reduction of work responsibilities, and Defendants' threats of harassment that was legally sufficient for a jury to find they were constructively discharged.

The Court should then reverse the district court's grant of Defendants' Rule 50(a) motion concerning CSS's status as Plaintiffs' integrated employer and a proper defendant. Glow and CSS's operations

and conduct were sufficiently so to create an "integrated enterprise" for purposes of imputing liability.

## STANDARDS OF REVIEW

**1. Motions for Summary Judgment —**

This Court reviews the district court's grant of summary judgment *de novo,* applying the same standard as the district court." *Clark v. EPCO Inc.*, 376 Fed. Appx. 427, 429 (5th Cir. 2010) (internal citations omitted). In considering the evidence to determine a motion for summary judgment, courts must:

- Draw all reasonable inferences in favor of the nonmoving party;

- Not make any credibility determinations or weigh the evidence;

- Disregard all evidence favorable to the moving party that the jury is not required to believe; and

- Give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent the evidence comes from disinterested witnesses.

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Only if, when considering the entire record, no rational jury could find for the nonmoving party, is the movant entitled to summary

judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 2. Judgment as a Matter of Law —

In ruling on a post-trial motion for judgment as a matter of law, the Court is "especially deferential to the verdict." *Mays v. Chevron Pipe Line Co.*, 968 F.3d 442, 447 (5th Cir. 2020) (cleaned up). Similar to a motion for summary judgment, the Court must "review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the [C]ourt may not make credibility determinations or weigh the evidence, as those are jury functions." *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). "A jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (quotation omitted).

### 3. Exclusion of Witness Testimony —

The Court reviews the admission or exclusion of evidence for abuse of discretion. *Tompkins v. Cyr*, 202 F.3d 770, 779 (5th Cir. 2000). If the Court finds a district court abused its discretion, the Court reviews the error under the harmless error doctrine. *Id.* The Court should reverse the

ruling if it "affected substantial rights of the complaining party." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

Argument

I. **The lower court dismissed race discrimination and retaliation claims of Green, Vicks, Price, Ologban, and Samuels because they could not show constructive discharge—a showing no longer required since the Court's ruling in *Hamilton*.**

This Court should reverse the district court's summary judgment dismissing the race discrimination and retaliation claims of Green, Vicks, Price, Ologban, and Samuels. Defendants challenged these causes of action, primarily because those Plaintiffs all resigned their employment. ROA.448. The district court correctly recited that, "To establish a prima facie case of race discrimination or retaliation, a plaintiff must show, among other things, that he or she suffered **an adverse employment action**." ROA.1154 (emphasis added) (citing *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021) (involving a Title VII claim); *Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 333 (5th Cir. 2014) (involving a Title VII claim)). The adverse action was the only element at issue.

Relying on cases like *Johnson* (7 F.4th at 408), the district court concluded it was Plaintiffs' burden to prove a "constructive discharge" to

show Plaintiffs suffered an adverse employment action. RE.4 ROA.1154-55. Because it concluded Plaintiffs could not show a hostile work environment, the district court concluded Plaintiffs could not meet the higher standard of constructive discharge. *Id.* (citing *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 195 (5th Cir. 1996)). However, constructive discharge is no longer required to demonstrate the requisite adverse employment action to maintain a retaliation claim. *See Hamilton v. Dallas County*, 79 F.4th 494, 497 (5th Cir. 2023); *Johnson-Lee v. Tex. A&M Univ.-Corpus Christi*, No. 2:23-CV-00229, 2024 WL 3196764, at *4 (S.D. Tex. Apr. 11, 2024). Previously, only "ultimate employment decisions" could constitute "an adverse employment action" giving rise to liability in the Fifth Circuit. *See Hamilton*, 79 F.4th at 502–03; *see also Johnson*, 7 F.4th at 408 (finding no adverse employment action absent a constructive discharge). The Fifth Circuit now holds that "an adverse employment action" does not require an ultimate employment decision. *Id.*; *see also Muldrow*, 601 U.S. at 348. Instead, a plaintiff need only allege facts plausibly showing discrimination not just in hiring, firing, and compensation, but also in the "terms, conditions, or privileges" of his

or her employment.[3] *Id.* The language "terms, conditions, or privileges of employment" is broad; it "is not limited to 'economic' or 'tangible' discrimination," and "it covers more than 'terms' and 'conditions' in the narrow contractual sense." *Id.*

*Hamilton's* analysis governs claims under the Civil Rights Act of 1866. Although *Hamilton* interpreted Title VII of the Civil Rights Act of 1964, this Court has "repeatedly explained that 'retaliation claims under [the Civil Rights Act of 1866] and Title VII are parallel causes of action,' which means they 'require proof of the same elements in order to establish liability.'" *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) (internal citation omitted). Accordingly, *Hamilton's* change regarding an "adverse employment action" should govern here.

When law changes in unanticipated ways during an appeal, this Court will generally remand for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new

---

[3] The Court recently acknowledged that a formulaic application of the elements of a hostile work environment claim, and, in particular, a requirement that there be an "ultimate" adverse "employment decision" led to "remarkable conclusions." *Hamilton*, 79 F.4th at 500 (citing *Peterson v. Linear Controls Inc.*, 757 Fed. Appx. 370 (5th Cir. 2019)) (finding there was no adverse ultimate employment decision where evidence reflected that black team members had to work outside without access to water, while his white team members worked inside with air conditioning.).

standard. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999). Fairness motivates this rule—to prevent injustice to a party who had no reason to expect a changed rule at the time of trial, or, in this case, summary judgment. *Id.* (citing *Hill v. International Paper Co.,* 121 F.3d 168, 176–77 (5th Cir. 1997)).

This is not an instance where Plaintiffs would have presented different summary judgment evidence under the standard of *Hamilton* than what they actually presented. Each Plaintiff discussed below offered sufficient evidence to the district court to create a fact issue on whether they each suffered discrimination in the "terms, conditions, or privileges" of their employment:

*Green —* Green testified that he was initially employed as a RAN engineer at Glow, promoted to quality assurance professional, and then "replaced" in that role by another employee and demoted back to being a RAN engineer. ROA.857-58. Green testified this was in response to him "starting a petition to submit to management." ROA.860; *see also* ROA.792. (exit report accusing Green of "attempt[ing] to organize a protest walkout"). He stated he was "going through the whole floor seeing

who would like to participate in the petition" and that he collected "30 people on the list prior to the demotion." RE.4; ROA.861.

After being demoted, harassed, and humiliated by Defendants, Green had no choice but to seek a new job and leave CSS and Glow. Green's demotion in response to his efforts to petition management regarding racial discrimination constitutes discrimination in the "terms, condition, or privileges of his employment." Green created a fact issue on element four of his discrimination claim.

*Vicks* — Vicks testified he was working a second job at Samsung while working for Defendants after he was denied a raise. ROA.1020. Defendants used an inside contact at Samsung to find out which of its employees were working there, including Vicks. *Id.* Defendants gave Vicks an ultimatum: resign from Samsung or be fired. *Id.* That ultimatum actually caused Vicks to resign and constitutes discrimination in the "terms, condition, or privileges of his employment." Additionally, his inability to take breaks was a privilege of his employment that he did not enjoy, while Indian and white workers did. Green created a fact issue on element four of his discrimination claim.

*Price* — Price testified he was offered a position in Los Angeles and promised by Defendants that he would work remotely as an engineer. ROA.975-77. Once Price started the job, he realized his job duties were limited to him—a Black man—driving other white and Indian engineers around. ROA.977. Defendants released Price from the project because he refused to be a personal driver for white employees rather than an engineer as promised. ROA.978. Price resigned when he realized Defendants expected him to act as a driver. *Id.*

Price resigned only after CSS Corp. manipulated him into a different job than what CSS Corp. promised and demeaned him to act as a chauffeur of people of other races. Defendants' refusal to honor the representations they made to Price about his job duties, and their treating him as inferior to other white engineers by making Price drive those engineers around, constitutes discrimination in the "terms, condition, or privileges of his employment."

*Ologban* — Defendants grouped Ologban together with other Black workers. ROA.906-07. Defendants did not allow Ologban to use his personal cell phone, while other workers were allowed to do so. ROA.1139. Defendants spoke to Ologban in condescending tones.

ROA.910. Defendants did not allow Ologban to wear his native dress while allowing Indian workers to wear their native dress. ROA.914. Defendants allowed supervisors to walk around and make videos of Ologban. ROA.1139 (referencing Ologban's testimony regarding Silat videotaping him). Defendants threatened to fire Ologban. ROA.1139. Defendants assigned Ologban more sites than they assigned non-Black workers. ROA.911-12. These acts caused Ologban to look for and take a new job opportunity for his "sanity." ROA.917. Those acts constitute discrimination in the "terms, condition, or privileges of his employment" that ultimately forced Ologban to resign his employment. Defendants' discrimination against Ologban constitutes discrimination in the "terms, condition, or privileges of his employment."

*Samuels* — Samuels was hired as a Tier 1 employee. Defendants grouped him in an assigned room with other Black employees. ROA.982, Defendants did not allow him to use his personal phone while other races were allowed. ROA.981. Defendants installed cameras to specifically watch him and other Black employees. ROA.982. Defendants denied Samuels a promotion and threatened to fire him. ROA.987. Samuels began work a second job at Samsung. ROA.988. Silat used an inside

contact at Samsung to find out which of its employees were working there, including Samuels. *Id.* Defendants gave Samuels an ultimatum: resign from Samsung or you will be fired. *Id.* Samuels was forced to resign from CSS Corp. to continue his job at Samsung. *Id.* Defendants' discrimination against Samuels constitutes discrimination in the "terms, condition, or privileges of his employment," and it constitutes retaliatory conduct actionable under Section 1981.

Under the new standard of *Hamilton*, Plaintiffs Green, Vicks, Price, Ologban, and Samuels have raised genuine issues of material fact on their discrimination claims and Samuels' retaliation claim that would allow a reasonable jury to find in their favor.

## II. The district court erred in granting judgment as a matter of law for Defendants pursuant to Rule 50(b), and this Court should reinstate the jury's verdict for Plaintiffs; or, alternatively, remit the verdict.

The district court misapplied the standards governing Rule 50(b) motions in rendering judgment as a matter of law for Glow. The district court ignored a statement of racist intent; disregarded evidence prefaced by subjective language; misapplied McDonnell Douglas; brushed aside instances of discrimination because they were not sufficiently severe, in contravention of the Supreme Court's recent decision in *Muldrow v. City*

*of St. Louis*, 601 U.S. 346 (2024); engaged in reweighing of the evidence, contrary to the relevant legal standards; and reviewed each act of discrimination in isolation rather than accounting for the cumulative effect of defendants' actions.

### A. The district court eliminated the consideration of a statement of racist intent.

The district court disregarded HR's instruction of "Don't lay off any white people," emphasizing that Defendants ultimately laid off a variety of races. RE.7; ROA.2399, 2872. Defendants did change its lay off list after Pauddar's reaction to the white people command. ROA.3187-88. But after the layoff, Defendants only rehired Indians and Asians. ROA.5122. Setting aside the ultimate hiring and firing decisions, the statement is nevertheless either direct or indirect evidence of discrimination.

The district court relies on *Jones v. Overnite Transportation*, 212 F.App'x 268 (5th Cir. 2006), to conclude that the statement is not direct evidence of discrimination. RE.7: ROA.2416. The Court in *Jones* found that a desire to fire Black employees was not specific enough to prove causation. *Jones*, at 273. On the other hand, testimony that "decision maker(s) in the poker room us[ing] race as a factor in employment decisions" and "maybe I've been told not to hire too many blacks in the

poker room" was enough to be direct evidence. *See Jones v. Robinson Prop. Group. L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).

Direct evidence is evidence that, if believed, proves the fact in question without inference or presumption. *Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008). For a remark to constitute direct evidence of racial discrimination, the statement must be (1) related to the protected class of persons of which the plaintiff is a member, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue. A memorandum that states that eliminating specific employees, each of whom were over fifty years of age, will "thin the ranks" and "we will have the flexibility to bring on some new players that can help us achieve our growth plans" met the four requirements of direct evidence. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003). Similarly, the statement, "Don't lay off any white people" is (1) race related, white and therefore not Black; (2) proximate in time to the employment decision, the statement was made at the time decisions were being made about layoffs (ROA.2963-64); (3) made by an individual with authority over the employment decision at

issue, Vice President of HR; and (4) related to the employment decision at issue: layoffs.

If a discriminatory statement does not meet the demanding standard of direct evidence, the statement may nevertheless be considered as indirect (circumstantial) evidence as "just one ingredient in the overall evidentiary mix." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457 (5th Cir. 2019) (quoting *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015)). Discriminatory remarks are relevant at the pretext stage. *Goudeau*, 793 F.3d at 475. The district court failed to consider the statements as evidence of pretext, some indirect evidence of discrimination.

## B. The district court improperly determined Plaintiffs' only evidence was their feelings, thoughts, and beliefs.

The district court recites that Plaintiffs' testimony was limited to descriptions of feelings, thoughts, and beliefs. RE.7: ROA. 2403-04, 2412. Testimony should not be wholly disregarded because a witness uses subjective expressions. Actual observations should not be excluded because there are prefaced by natural colloquial speech. *See, e.g., Finch v. United States*, 433 U.S. 676, 681 (2009) (Rehnquist, J., dissenting) ("If the Court feels"); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 617 (1977)

(Marshall, J., dissenting) ("I therefore feel"); *Brewer v. Williams*, 430 U.S. 387, 409 (1977) (Marshall, J., concurring) ("I think"); *J.A. Masters Investments v. Beltramini*, 117 F.4th 321, 324 (5th Cir. 2024) (J. Haynes, dissenting) ("I think"); *Spiller v. Harris Cnty., Tex.,* 113 F.4th 573, 582 (5th Cir. 2024) (J. Willett, concurring) ("I believe").

To be sure, testimony solely based on subjective beliefs is not sufficient evidence. *See Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999). However, the testimony was not limited to subjective assumptions. For instance, Walker testified he could not only feel, but he could also see the discrimination because of race. ROA.3252. Paul Tijani said he knew he was discriminated against and retaliated against; he didn't just feel it. ROA.3302-03. All this, when combined with the evidence of actual disparate treatment of Black workers, is competent evidence of pretext and discrimination.

## C. The district court misapplied McDonnell Douglas.

### 1. Plaintiffs provided evidence at trial supporting the proof recognized by McDonnell Douglas.

#### a. The Prima Facie Case.

Plaintiffs addressed the prima facie case in response to Defendants' Rule 50(b) motion. ROA.2192-96. The district court ignored that

Plaintiffs established a prima facie case for race discrimination, treating it as irrelevant after a verdict. RE.7; ROA.2398-439. The district court did not expressly dispute that Plaintiffs established the prima facie case, which created an inference of discrimination. RE.7; ROA.2398-439.

### b. Defendants' Pretext.

Pretext may be shown in a variety of ways:

- **Disparate treatment.** *Stennett v. Tupelo Pub. Sch. Dist.*, 619 Fed. Appx. 310, 317 (5th Cir. 2015) (citations omitted).

- **Lack of investigation** *Owens v. Circassia Pharms., Inc.,* 33 F.4th 814, 828–29 (5th Cir. 2022) (An employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the "defendant's explanation ... unworthy of credence" and permits an inference of discrimination)

- **Weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions.** *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (internal quotation marks and citation omitted); *Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*, 9 F.4th 317, 325–26 (5th Cir. 2021) (citations omitted) (Any evidence that casts doubt on the employer's assertion is in play, and a fact dispute exists so long as the plaintiff's evidence "is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions").

- **Failure to follow policies.** *See Lindsey*, 9 F.4th at 326.

## 2. An Employer's Subjective Reason Is Inappropriate.

Subjective criteria is inappropriate for the employer's explanation of an adverse action. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001). One reason for not allowing subjective reasons is "to prevent the judge from making credibility determinations in the summary judgment context. *Id.* Deciding the appropriateness of using measures that is "in the eye of the beholder" is "the trier-of-fact's duty to determine." *Id.* at 682; *see also Crawford v. W. Elec. Co., Inc.,* 614 F.2d 1300, 1315 (5th Cir. 1980). Another reason is to allow a plaintiff a fair opportunity to rebut the alleged reasons. The defendant must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981). Additionally, because it is possible for an employer to discriminate without doing so willfully, a jury was entitled to reject the employer's claim that it "believed" the plaintiff had committed the conduct it relied upon. *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 481 (5th Cir. 2007), order clarified (Sept. 27, 2007) (ADEA case) (rejecting excuse that employer "believed" plaintiff voluntarily resigned).

### 3. The District Court's Misapplication of McDonnell Douglas.

The district court misapplied the McDonnell Douglas framework in three key respects. First, it held that plaintiffs had the burden of showing that any discrimination suffered by one plaintiff was also suffered by all other Black employees, and that no non-Black employees experienced the same mistreatment. Second, the court dinged plaintiffs for failing to show they were discriminated against "because of" race, despite plaintiffs having met their burden. Third, at step-two of McDonnell Douglas, it held that defendants need only show a race neutral reason for *adopting* a policy, rather than a legitimate reason for racial discrimination.

### a. Discrimination Does Not Have to Be Against All

It is axiomatic that Civil Rights Acts protect "individuals, not groups" in the abstract. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 658 (2020) (construing Title VII). Race discrimination against one Black employee cannot be cured either by (1) subjecting a non-Black employee to the same disfavored treatment, or (2) exempting at least one other Black employee from discrimination. *See, e.g.*, *id.* at 659 (firing a man does not offset discriminatory firing of a woman); *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579 (1978) (employer must "provide an

equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force"); *Cty. of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 708-09 (1978). Yet that is precisely what the district court concludes throughout its order: that plaintiffs' claims fail unless *all* Black employees faced the same mistreatment and *no* non-Black employees were similarly affected.

Take, for example, several plaintiffs' claims that they were routinely given the wrong site location information for cell towers they were assigned to. The district court rejected this claim because plaintiffs "did not testify that *only* black employees were given wrong sites." RE.7; ROA.2406 (emphasis original). Similarly, the court held that there was insufficient evidence to show that defendants disproportionately disciplined Black employees for low-level policy violations "because employees of all races were reported for misconduct." RE.7; ROA.2410. This erroneous mode of analysis led the district court to summarily reject numerous other forms of discrimination that were well-supported by the evidence. *E.g.* RE.7; ROA.2427. (Yarbrough could not have been demoted because of race because one White employee also demoted); RE.7;

ROA.2437. (Pringle not laid off because of race because "Glow's layoff list … included employees of all races"); RE.7; ROA.2402 ("not all black employees were seated in front of the cameras").

Relatedly, the district court also concluded throughout that various discriminatory acts were not "because of" race yet provided no reasoning to support its conclusions. To raise an inference that they were discriminated against "because of" race, plaintiffs only needed to show that they suffered an adverse employment action that a similarly situated white employee did not suffer. *See Watkins*, 997 F.3d at 281; *see also Reeves*, 530 U.S. at 143, 148. Yet the trial court disregarded this evidence of discrimination in numerous instances.

For example, undisputed evidence from several witnesses showed that Black employees were not allowed to wear dashikis—traditional African attire—whereas Indian employees were permitted to wear similar traditional attire to work. ROA.2959:11-22. The district court summarily held that this did not constitute discrimination because there was "no evidence" that the dress code policy was "racially motivated." RE.7; ROA.2419. A practice of explicitly singling out a racial group for disfavored treatment is a quintessential example of discrimination. The

district court's inexplicable conclusion that the policy is somehow race neutral simply makes no sense.

Similarly, before being laid off, Silat taunted Brown, telling him that he would be fired and two White employees would be retained in his place. RE.7; ROA.2433. The district court summarily held that Brown's subsequent firing could not have been "because of race." *Id.* The trial court's order is peppered with similar errors throughout. *E.g.* RE.7; ROA.2432 (Defendants changing Brown's schedule); RE.7; ROA.2418-19 (dismissing evidence that Black employees were forced to work more while being paid less than White peers); RE.7; ROA.2422-23 (Black employees being forced to do menial work, such as clean the dishes); RE.7; ROA.2415-16. (Pringle and Brown denial of overtime).

The district court improperly inferred Defendants did not discriminate because they hired Black employees in the first place. RE.7; ROA.2399. That analysis would defeat every employment discrimination claim. Such claims necessarily involve a member of a protected class who has been hired by someone. Defendants do not provide evidence that the same actor who hired the plaintiffs discriminated against the plaintiffs. Regardless, the same actor inference is just that, an inference. The Court

should examine, instead, the evidence as a whole. *See Haun v. Ideal Industries, Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (age discrimination case); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000) (affirming a jury verdict when the same person hired and fired the plaintiff); *Fitzpatrick v. Pontotoc Cnty., Miss.*, 612 Fed. Appx. 770, 776 n.5 (5th Cir. 2015) (noting that the same actor inference does not rule out the possibility of proving discrimination).

Contrary to the district court's analysis, a discrimination claim does not fail simply because an employer does not discriminate against every member of the class. *See Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1272-73 (10th Cir. 1988) (sex discrimination case). An employer may not rely on the treatment of other members of the same protected class as a defense to a discrimination claim. *See Connecticut v Teal*, 457 U.S. 440, 442 (1982); *see also Furnco Construction Co. v. Waters*, 438 U.S. 567, 579 (1978). There "is no token exception to anti-discrimination law." *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 741 (5th Cir. 2017), as revised (Mar. 13, 2017) (quoting *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587–88 (7th Cir. 2011)); *see also Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992).

Virtually all the Black engineers were terminated (*see* ROA.5122), and none were returned except for Price, as a chauffeur in Compton California. ROA.4331-32. Tokenism also negates the district court consideration of a few non-Black employees of similar adverse treatment, i.e. surveilling by cameras, as refutation of discrimination. RE.7; ROA.2402. The district court substituted its judgment for that of the jury, assuming validity of Defendants' excuses for installing the cameras. RE.7; ROA.2402-03. A jury may reject that excuse as pretext based upon evidence.

For example, Lofland testified he noticed discrimination with the placement of the surveillance cameras, because Defendants place a majority of the Black employees in the front rooms under the cameras, after initially allowing employees to choose their own seat assignments. ROA.2848-50. Yarbrough also noticed that although persons of other races had already been sitting in the two front rooms, when the Defendants installed cameras, they moved Black employees in front to be under those cameras to be monitored. ROA.2956. Paul Tijani confirmed the room with the camera was almost all Black employees and the few Indian or White employees in the room were allowed to come and go.

ROA.3316. The Defendants monitored how long Black employees would be on breaks and what Black employees were doing on breaks, but when it came to the Indian workers, Defendants allowed long breaks. No one was monitoring Indian workers or trying to see what they were doing. ROA.2956. They were targeting the Black employees. ROA.2956. The Defendants demoted Lee and moved him to the front room with cameras again. ROA.2859. And, similarly, after Aigheyisi complained, the Defendants moved him to in front of the camera. ROA.3689-94.

The district court disregarded all of this evidence in favor of the Defendants' pretext that the cameras were placed in the rooms for security purposes only. RE.7; ROA.2401. The district court assumed, contrary to the testimony, that the policy applied to all employees in a neutral manner and found that it was unreasonable for the jury to believe otherwise. RE.7; ROA. 2401-02. Whether the cameras were installed (at least in part) to monitor attendance or for some security purpose does not negate the testimony that the cameras were also used disproportionately to monitor Black employees by moving many more of them in front of the cameras. Defendants do not offer a reason for moving Black employees in front of the cameras. The district court should not have disregarded the

treatment of the number of Black employees versus the number of non-Black employees it assigned seats under the cameras. Racial discrimination can be shown in proportional disparities. *See Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982).

### b. Proof of the Prima Facie Case Plus the Falsity of the Employer's Reason Satisfies "Because of Race."

The district court disregarded the inference upon which a jury may rely created by the McDonnell Douglas framework sufficient to show the actions were because of race. Contrary to *McDonnell Douglas*, the district court held that a prima facie case, together with a showing of pretext, is not circumstantial evidence of discrimination or retaliation. *See, e.g.*, RE.7; ROA.2418, 2425, 2432-33, 2436, 2439 (plaintiffs must still show discrimination "because of their (his) race"). Under McDonnell Douglas, the prima facie case creates a presumption of discrimination *and* "although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (reviewing the sufficiency of a jury verdict). "Thus, a plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id* at 148. Evidence of pretext combined with the prima facie case is enough to permit a factfinder to find discrimination. *See id.* The district court erred in disregarding the inference of discrimination created by proof of the prima facie case. The district court refused to allow the jury "to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147.

The purpose of the McDonnell Douglas framework is to create the circumstantial inference of discrimination, not just a jumping off place requiring more evidence of intent. *See McDonnell Douglas v. Green*, 411 U.S. 792, 804-06 (1973). While a court need not parse the evidence under the McDonnell Douglas framework to uphold a verdict, viewing the case as a whole, a court may not ignore the inference created by evidence of the framework. *See id.*

Proving McDonnell Douglas also satisfies the but-for causation standard of McDonnell Douglas. *See Garcia v. Prof'l Contract Services, Inc.*, 938 F.3d 236, 243 (5th Cir. 2019); *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (But for causation standard does

not demand anything beyond what is already required by the *McDonnell Douglas* "real reason" standard). The trial court, following the Fifth Circuit Pattern Jury Instructions, informed the jury that but-for causation was required for proving discrimination and retaliation, and that if they disbelieved the reason given by Defendants for the adverse action, they may find proof of discrimination or retaliation. ROA.1386, 87.

The Supreme Court recently explained that but-for cause is not sole cause; events have multiple but-for causes. *See Bostock*, 590 U.S. at 656. Congress did not even require discrimination or retaliation to be the primary cause when it prohibited the behavior. *See id.* at 656-57. Under this standard, disproving one of the employer's reasons is enough. *See Jiang v. Tex. Comm'n on Envtl. Quality*, 321 F. Supp. 3d 738, 747 (W.D. Tex. 2018) ("A reasonable jury could conclude that Defendants were not being truthful about some of their stated reasons for terminating Jiang, infer from that conclusion that the other stated reasons are also untrue, and then further infer from the totality of the evidence that the true reason was discriminatory.").

### c. Failure to Provide a Reason for the Different Treatment.

More troubling than ignoring evidence of pretext, the district court failed to require the employer to provide a legitimate non-discriminatory reason for the disparate treatment under McDonnell Douglas. Instead, it held that defendants satisfied their burden by pointing to a race neutral policy, rather than the actual requirement: an explanation for why *these particular plaintiffs* were treated worse than similarly situated non-Black plaintiffs. *E.g.*, *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015).

For example, the district court blessed Defendants' discriminatory policy of forcing plaintiffs to sit in front of certain cameras because Defendants "had a legitimate business reason for installing the cameras at the front of the work room: namely, to monitor *all* employees' conduct." RE.7; ROA.2401. (emphasis original). The question is not whether Defendants had a legitimate reason for *installing* the cameras. Rather, Defendants had to provide a legitimate reason for the alleged adverse employment action: namely, why certain Black employees were forced to sit in front of the cameras while similarly situated non-Black employees

were given the freedom to sit where they pleased. Defendants' reason for installing the cameras in the first instance does not answer that question.

Similarly, the court brushed off evidence showing that plaintiffs' breaks were closely monitored while non-Black employees were permitted to take longer breaks under less scrutiny because Defendants had "a non-discriminatory reason for monitoring these employees' breaks—namely, to ensure the breaks did not impede their work performance." RE.7; ROA.2414. But that "reason" does not address the disparate treatment plaintiffs suffered, as *McDonnell Douglas* requires. *See also* RE.7; ROA.2435 (barring Ashiru from using cell phone to communicate with technicians).

The district court's failure is especially striking because the evidence that Defendants' policies were unevenly enforced was overwhelming. Defendants implemented a policy to not use personal cell phones on the job and only enforced that policy on Black employees. ROA.3253:10-ROA.3255:18; ROA.3257:22-ROA.3258:17. Defendants allowed non-Black employees to read on the job during downtime, but not Black employees. ROA.3256:1-ROA.3257:21. Black employees were not allowed to choose which room to work in; they were assigned to the front

rooms. ROA.3258:12-ROA.3259:20. Black employees were watched on cameras, while non-Black employees were not. ROA.3259:21-ROA.3261:24. The policy on being late was not enforced equally. ROA.3267:01-ROA.3268:17. Although the Defendant had a sign-up list for those who wanted to work overtime, Black employees were consistently denied overtime opportunities. ROA.3267:01-3268:17; ROA.3986:01-25; ROA.4056:14-ROA.4057:17. And, as discussed, Black employees could not take as long of breaks as non-Black employees. ROA.3272:09-19. Defendants failed to offer any legitimate reason for the disparate enforcement of workplace policies.

"A jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen*, 47 F.3d at 700 (quotation omitted). Considering the evidence provided under the McDonnell Douglas standard, the inferences in favor of the Plaintiffs, the common evidence, and considering the totality of the facts, the district court incorrectly concluded no legally sufficient evidentiary basis existed for a reasonable jury to find for the Plaintiffs.

**D. The district court erroneously held that discriminatory acts were insufficiently severe to constitute an adverse employment action.**

In *Muldrow*, the Supreme Court recently clarified that an adverse employment action must only cause "some 'disadvantageous' change in an employment term or condition." *Muldrow*, 601 U.S. at 354. In other words, it must cause "some harm," whether "tangible," or intangible. *Id.* The harm need not be "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355.

The district court erred here by applying such a "heightened bar" to the plaintiffs' evidence of discrimination. It held, for example, that Defendants' policy of forbidding Black employees from wearing traditional dress (*see* ROA.2959:11-22) was only actionable if "tied to" their eventual termination. RE.7: ROA.2420. But a race-based dress code policy is itself actionable discrimination because it effects tangible harm, and in any event, is evidence that the jury may consider when deciding whether plaintiffs' terminations were motivated by race.

The district court observed that when Silat gave certain plaintiffs incorrect site information (*E.g.*, ROA.3339:15-19) it "frustrated

[plaintiffs'] ability to perform their job duties" RE.7: ROA.2406—thus meeting the standard of an adverse employment action. But the court nevertheless concluded that the harm was insufficient to be actionable because Silat would eventually correct the information later (after plaintiffs wasted time working on the wrong site). This conclusion cannot be squared with *Muldrow*. RE.7: ROA.2407.[4]

### E. The district court reweighed the evidence, contrary to the JMOL standard.

When reviewing a JMOL motion, the district court must draw all reasonable inferences in favor of the verdict and may only overturn the verdict if there "no legally sufficient evidentiary basis" to support it. *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995). The trial court "may not make credibility determinations or [re]weigh the evidence." *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). Yet that is precisely what the trial court did here. It turned the JMOL standard on its head, resorting to a freewheeling reweighing of the

---

[4] The district court also held that Lofland—who is white and never received incorrect site information—could not serve as a comparator because he was a manager. RE.7 ROA.2407. But the court never explains (and the record reveals no reason) why Silat would be less likely to send incorrect site information to a manager. Lofland is accordingly a proper comparator.

evidence, crediting Defendants' version of events, and ignoring the substantial countervailing evidence that plaintiffs introduced.

Examples abound. As to Peter Tijani's termination, the trial court brushed aside the evidence of discrimination and credited Defendants' version of events wholesale (that he was fired for minor policy violations). RE.7; ROA.2423-24.. The district court did the same for Aigheyisi. The court credited Defendants' evidence that he was fired for a handful of petty policy violations, finding it more compelling than the substantial evidence of race discrimination introduced by plaintiffs. RE.7; ROA.2424-25; *see also e.g.* RE.7; ROA.2428-30 (crediting Defendants' rationale for declining to promote Walker); RE.7; ROA.2415 (crediting reason for denying Pringle overtime).

## F. The district court failed to account for the cumulative weight of the evidence.

Claims of disparate treatment must be evaluated under the "totality of the circumstances," such that courts must consider the collective weight of the evidence. *Luna v. Corr. Corp. of Am.*, 469 F. App'x 301, 303 (5th Cir. 2012) (collecting cases). Evidence in the case must be viewed as a whole. *See Bray v. Marriott Hotels*, 110 F.3d 986 (3d Cir. 1997) ("A play cannot be understood on the basis of some of its scenes but

only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." (internal citation omitted).

Other instances of discrimination may well be relevant to the claims of the individual Plaintiffs at issue. *See Sprint/United Management Co. v. Mendelsohn*, 522 U.S. 379, 387-88 (2008). A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext. *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022); *see also Ahmed v. Johnson*, 752 F.3d 490, 497 (1st Cir. 2014); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994); *Martin v. Winn-Dixie Louisiana, Inc.*, 132 F. Supp. 3d 794, 817–18 (M.D. La. 2015). The district court addressed dozens of incidents of discrimination sequentially, in isolation, never assessing the aggregate weight of the evidence. Rather the court concluded that each incident, standing alone, did not meet every element of the relevant claim. RE.7; ROA.2399-455. This error alone requires reversal.

## G. The jury's retaliation verdicts are supported by the evidence.

### 1. Sufficient evidence supports the jury's conclusion that Defendants retaliated against Lofland and Paul Tijani for opposing racial discrimination.

Lofland was demoted after complaining to Pauddar about Glow's discriminatory treatment of Black employees. Lofland chronicled instances of discrimination and asked Pauddar whether perhaps HR could intervene to ensure Black employees were treated more fairly. ROA.2869:01-ROA.2870:10. When he informed Pauddar that certain employees were planning a protest in response to the company's mistreatment of Black workers, Pauddar shot back that "every single" employee that participates in any protest or complaint "will be fired on the spot." ROA.2863:08-ROA.2865:09. Lofland also separately complained to Silat, complaining that Defendants' policies were not being enforced equally among Black employees and non-Black employees. ROA.2853:03-12.

Despite the evidence of Lofland making several complaints of racial discrimination, the district court inexplicably concluded that the jury's retaliation verdict must be overturned because Lofland never "specifically opposed an unlawful employment practice." RE.7; ROA.2442. Specifically, the district court concluded that it wasn't

sufficiently clear that Lofland was complaining about racial discrimination. RE.7; ROA.2442.

It is evident from Lofland's complaints that he is concerned about racial discrimination, indeed Pauddar understood him to complaints to be directed at the mistreatment of Black employees. ROA.2869:01-ROA.2870:10; ROA.2863:08-ROA.2865:09. Contrary to the district court's conclusion, there is no requirement that a plaintiff use certain "magic words" or otherwise employ legalese when opposing racial discrimination in the workplace. Lofland's complaints explicitly referenced racial discrimination; nothing more was needed. *See Morrison v. Dallas Cnty. Cmty. Coll.*, 273 F. App'x 407, 410 (5th Cir. 2008) (plaintiff "engaged in protected activity when he orally complained of race-based discrimination").

The district court's conclusion that Paul Tijani's complaints of racial discrimination—which included complaints that he was a "victim of discrimination," and was "oppressed and humiliated." (ROA.3483:14-19)—must be reversed for the same reason.

## H. The jury's verdict that Glow retaliated against Aigheyisi and Peter Tijani is not against the great weight of the evidence.

*Paul Tijani.* The district court concluded there was sufficient evidence to support the jury's finding that Defendants retaliated against Peter for reporting racial discrimination based on (1) the proximity between Peter's complaint and his termination; and (2) Human Resources' "failure to acknowledge" Peter's complaints. RE.7; ROA.2447-48. The district nevertheless overturned the jury's verdict, concluding that it was against the "great weight of the evidence." RE.7; ROA.2450. Specifically, the district court found compelling that Peter's exit interview listed Peter's performance as "unsatisfactory" in certain areas, and that the two-week gap between Peter's complaint and termination "is insufficient to find pretext." RE.7; ROA.2449. But this Court has held "that a six-and-a-half-week timeframe is sufficiently close" to infer retaliatory intent. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020). And an unsatisfactory rating on an exit interview—occurring after Peter was terminated—is, if anything, indicative of further retaliation.

*Aigheyisi.* The district court concluded that there was sufficient evidence to support the jury's retaliation verdict as to Aigheyisi, who was

fired the same day that he complained of racial discrimination. RE.7:
ROA.2450-52. But the court held the verdict was against the great weight
of the evidence because of Aigheyisi's petty policy violations and negative
comments on his exit report. RE.7: ROA.2452-53. The negative
comments, however, were recorded *after* Defendants fired him in
retaliation for his complaint and are the consequence of further
retaliation. And the policy violations (such as for playing on his phone
during breaks at work) were the product of the very discrimination about
which Aigheyisi complained. *See supra* Statement of the Case, Sec. B
(discussing discriminatory application of workplace policies). This does
not establish that the verdict was against the preponderance of the
evidence, let alone the great weight of the evidence. *Long v. Faenas
Transp., L.L.C.*, No. 21-40268, 2021 WL 5119717, at *2 (5th Cir. Nov. 3,
2021) ("court should not grant a motion for a new trial unless the verdict
is against the great weight, not merely the preponderance, of the
evidence") (quotations omitted).

## I. The Verdict Was not the Result of Unfair Passion or Prejudice.

The testimony of an imported caste system did not create unfair
passion or prejudice. It is by definition discrimination itself.

Discrimination based on race is a cultural matter and is a violation regardless of the culture. Discussing caste systems in discrimination is not uncommon. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 274 (1995) (Ginsburg, J., dissenting) (recognizing that the "lingering effects" of discrimination, "reflective of a system of racial caste only recently ended, are evident in our workplaces, markets, and neighborhoods"); *Dotson v. City of Indianola, Miss.*, 739 F.2d 1022, 1027 (5th Cir. 1984) (Wisdom concurring) (This type of discrimination against racial groups is precisely the kind of discrimination prohibited by the Civil War Amendments and the Voting Rights Act. The effect of that discrimination was to continue the historic caste status of blacks.); *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant*, 491 F.2d 1364, 1373 (5th Cir. 1974) (referring to froze black employees frozen "into a discriminatory caste"); *Chance v. Bd. of Examiners & Bd. of Ed. of City of New York*, 534 F.2d 993, 1001 n. 1 (2d Cir. 1976), opinion modified on reh'g sub nom. *Chance v. Bd. of Examiners & the Bd. of Educ. of the City of New York*, No. 75-7161, 1976 WL 13310 (2d Cir. May 17, 1976).

Aside from evidence of a caste system shown by the hierarchy withing the organization, Plaintiffs presented an abundance of evidence showing disparate treatment and admission of discrimination in the statement prohibiting the lay of any white people. Defendants have not presented evidence that the jury relied on unfair passion or prejudice.

## J. Identical compensation awards were not excessive.

The Plaintiffs' damages were unique in that they were identical to each other. The damages for emotional distress or mental anguish that attacks the dignity of the core of the meaning of being human: dignity. The Supreme Court recognizes the harm to dignity, noting that monetary damages under anti-discrimination statutes are "necessary to make discrimination victims whole for the terrible injury to their careers, to their mental and emotional health, and to their self-respect and dignity." *United States v. Burke*, 504 U.S. 229, 241 n. 12 (1992) (quoting H.R. Rep. No. 102–40, pt. 2, p. 25 (1991) (Report of Committee on the Judiciary). The Supreme Court also acknowledges that compensation under Title VII includes harm to reputation. *Id.* at 239. "[R]acial discrimination ... is a fundamental injury to the individual rights of a person." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661

(1987); *see Monroe v. Columbia Coll. Chicago*, 990 F.3d 1098, 1100 (7th Cir. 2021), reh'g denied (Apr. 12, 2021) ("An injury resulting from discrimination produces impairments and wounds to the rights and dignities of the individual."); *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993); *Mayberry v. United States*, 151 F.3d 855, 859 (8th Cir. 1998) (discussing tax consequences for dignity losses in an ERISA claim.) The injury to rights and dignity of the Plaintiffs were the same: the disrespect of the person as an equal. The dignity damages were appropriately the same for each individual.

### K. Evidence of Mental Anguish.

Plaintiffs testified to mental anguish, humiliation, pain and suffering, emotional distress, and loss of enjoyment of life, and most importantly, damage to dignity. Expert or corroborating testimony is not required for an award of mental anguish damages. *See Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 470–471 (5th Cir. 2001); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998). Plaintiffs testified in sufficient detail about the emotional harm.

Plaintiffs did not ask for lost wages at trial. Many of them proceeded to get better paying jobs, further proof that they were good

employees and good at their job. Lost wages are not the real damages to the Plaintiffs. The real damages are the damages to their dignity. Plaintiffs each had a substantial amount of evidence regarding the damage to their dignity; their testimony and the evidence is legally sufficient to recover the dignity and emotional damages the jury awarded.

*Matt Lofland.* Lofland was forced to delay his wedding due to the demotion and leaving Defendants' company. ROA.2879:05-16. The new company paid less and did not provide any paid time off or sick time. ROA.2879:05-16. Lofland was proud of the work he did for Defendants. ROA.2879:21-ROA.2881:04. When he was demoted several levels below his current position for opposing and reporting race discrimination, Lofland felt as if he had wasted a year of his life. ROA.2879:21-ROA.2881:04. He stood up for what he knew was right and was punished. ROA.2879:21-ROA.2881:04. He became depressed and anxious, taking Lexapro, an anxiety medication. ROA.2879:21-2881:04.

Lofland made an important point when he said, "you always hear about discrimination and racism, but this was the first time it was in my face." ROA.2881:01-02. He thought that if he addressed the issue,

Defendants would change and stop. ROA.2881:02-04. Nothing changed. ROA.2881:02-04. Defendants should never have discriminated in the first place and had numerous opportunities to stop and fix the problem; instead, when those like Lofland chose to stand up and do what it right, they were punished. The jury saw the truth in Lofland's testimony and awarded appropriate dignity and emotional distress damages.

*Joshua Yarbrough.* Like Lofland, Yarbrough was demoted multiple levels without warning. ROA.2973:10-ROA.2983:12. Yarbrough never saw it coming. ROA.2973:18. Initially, Yarbrough had anxiety about the demotion and seemed to initially be in shock. ROA.2973:10-ROA.2983:12. It was hard to believe that the series of events of the way the Defendants systematically treated their Black employees differently from its non-Black employees and it came to a head when Yarbrough told Pauddar that he did not like the way Defendants were treating its Black employees. When Pauddar demoted Yarbrough, giving his duties to Karen Montalbo (non-Black), Yarbrough could not take it anymore. ROA.2973:10-ROA.2983:12.. He had to leave. ROA.2973:10-ROA.2983:12. He was frustrated. ROA.2973:10-ROA.2983:12. He was upset. ROA.2973:10-ROA.2983:12. He has lasting effects and questions

the motives of his current employers. ROA.2973:10-ROA.2983:12. Certain events at his current job will trigger memories of the discrimination and retaliation he experienced while working for the Defendants. ROA.2973:10-ROA.2983:12. He was depressed, could not sleep, and still has trouble believing that "we actually still have to deal with these things [racial discrimination and retaliation] in today's time." ROA.2973:10-ROA.2983:12. The jury agreed.

Yarbrough's wife, Jaquia Drew, corroborated Yarbrough's testimony when she testified to the effects the Defendants' treatment of Yarbrough. Yarbrough was deflated and frustrated. ROA.4233:18-21.. He was depressed, stressed, and sad. ROA.4233:18-21. She spoke about how he used to laugh at TV shows and sleep well before working for Defendants and the demotion. ROA.4234:01-09. After the treatment and demotion, he could not engage in the same way. ROA.4234:01-09. He started to come back to life after he left Defendants. ROA.4234:01-25. This further supports the jury's compensatory damages awards, the dignity damages, for Yarbrough.

***Peter and Paul Tijani.*** Paul Tijani was scared for his job, but knew he had to stand up and try to stop the discrimination and retaliation.

ROA.3341:01-20. Defendants humiliated Paul Tijani. ROA.3325:09-24. He cried in the bathroom at work. ROA.3325:09-24. He had nightmares, felt hopeless, depressed, and anxious while he worked for Defendants. ROA.3325:15-24. He felt hopeless. ROA.3325:15-24. Defendants had "no humanity." ROA.3325:15-24. It was new slavery. ROA.3610:07-10. To this day, thinking about Defendants and the way they treated him makes him want to cry. ROA.3344:18-ROA.3347:24. His wife was pregnant when he was terminated, and his termination made it hard to provide for his family. ROA.3344:18-ROA.3347:24.

Paul Tijani spoke to a counselor but could only afford one visit. ROA.3346:06-10. He lives with the trauma today. ROA.3346:10. Paul Tijani brought this lawsuit for justice for himself and the other workers. ROA.3344:18-ROA.3347:24. Paul Tijani made it clear that race discrimination and retaliation should not happen to anyone and "no one should be treated lesser of a human than other people" because of race. 839:3-7.

Peter Tijani testified that the Defendants treatment was mentally, emotionally, physically, and spiritually bad and draining. ROA.3509:13-ROA.3519:24. He could not sleep. ROA.3509:13-ROA.3519:24. It felt like

going to a war front as he drove to work. ROA.3509:13-ROA.3519:24. He had trouble eating. ROA.3512:9-17. He had nightmares. ROA.3512:9-17. Peter Tijani continues to go to counseling because of the effect from Defendants' treatment of him. ROA.3512:18-23. When he was terminated, Tijani tried to leave quickly so that his manager would not see him cry. ROA.3515:02-10. For weeks following his termination, Tijani cried, was hopeless, and felt like everything was over. ROA.3516:12-22. Because Defendants gas lighted Tijani and did not fix the discrimination after Tijani complained, reported, and opposed it, Tijani began to question himself, his sincerity and hard work. ROA.3517:01-10. He knew he did everything right, but Defendants made Tijani question his ethics. ROA.3517:01-10.

Peter Tijani was offered another job that paid more than Defendants. However, when he saw that Pauddar and Silat worked there, Peter Tijani immediately quit. ROA.3517:16-1010:15. It was better emotionally for Peter Tijani to not receive $90,000 per year than to have to experience the same kind of unequal treatment from Pauddar and Silat. ROA.3517:16-ROA.3518:15. Pauddar and Silat were not held accountable when they worked for Defendants; in fact, they were

rewarded by having Silat's girlfriend, Karen Montalbo, promoted over Black employees. Conduct rewarded is conduct repeated.

Peter Tijani saw that Defendants wanted Black employees for cheap labor and then push them out; he had to speak up. ROA.3519:08-19. He was punished for it and carries the mental, physical, emotional, and spiritual effects of it today. ROA.3509:13-ROA.3519:24. . Defendants damaged his dignity. ROA.3509:13-ROA.3519:24. The jury understood and awarded damages appropriately.

Tunde Oladipupo, former college roommate of Peter and Paul Tijani, testified about impact of Defendants' treatment on them. ROA.4211:13-ROA.4212:06. The Tijani brothers were always happy and cheerful before working for Defendants. ROA.4212:18-25. After working for Defendants and being retaliated against, the brothers had mood changes and were depressed. ROA.4213:07-22.. They did not go out as much. ROA.4213:07-22. Oladipupo witnessed Paul Tijani crying. ROA.4213:25-ROA.4214:10. Oladipupo witnessed how sad Peter Tijani looked. ROA.4213:25-ROA.4214:10. Paul Tijani used to organize cookouts, but he does not do that anymore. ROA.4216:11-25.Abimbola Adeboye is an old college friend of the Tijani brothers and now friend of

Aigheyisi. ROA.4221:05-16.. Prior to experiencing the discrimination and retaliation from Defendants, the Tijani brothers were fun to be around. ROA.4222:01. After the discrimination and retaliation, Adeboye noticed that they drink more alcohol and saw Paul Tijani cry for the first time. ROA.4222:14-25.

Peter and Paul Tijani's sister, Esther Tijani, spoke of the lasting effects of their discrimination and retaliation. Prior to the discrimination and retaliation, her brothers were funny people and the life of the party. ROA.4178:03-10. While the Tijani brothers experienced the discrimination and retaliation from the Defendant, Esther felt as if she lost her brothers; they became different people; and they call Esther and cry on the phone to her. ROA.4178:14-25.

The jury saw the impact of how Defendants' treatment affected Paul Tijani's dignity and life and awarded the proper damages.

*William Aigheyisi.* Aigheyisi's termination, along with Defendants' consistent gas lighting and treating him unequally on a daily basis made him feel worthless, never good enough, and like he was not able to defend himself and vulnerable. ROA.3738:03-3739:18. Aigheyisi described his experienced anxiety as like being pumped up in the moment and

attacking. ROA. ROA.3740:09-ROA.3742:05. His anxiety would build over time, and he did not know how to control it or calm down. ROA.3740:09-ROA.3742:05 He could not sleep. ROA.3740:09-ROA.3742:05 Defendants' treatment made Aigheyisi feel horrible about himself—like he could not defend himself. He was hopeless and vulnerable. ROA.3740:09-ROA.3742:05 It was hard for Aigheyisi to open up and share these intimate details on the witness stand at trial, but he needed to tell the truth and talk about it in front of the jury and Court. ROA.3740:09-ROA.3742:05

Aigheyisi's sister, Uwa, testified that she witnessed Defendants' treatment of her brother. They lived together while Aigheyisi worked for Defendants. ROA.4316:08-15. During that time, Uwa noticed changes in Aigheyisi's demeanor. ROA.4316:20-ROA.4320:07. Usually, Aigheyisi is a happy and bubbly person, but Uwa noticed he became depressed while working for Defendants. ROA.4316:20-ROA.4320:07.He would not open up to his family about his feelings. ROA.4316:20-ROA.4320:07. He would complain more, lock himself in his room, and did not want to talk to anyone. ROA.4316:20-ROA.4320:07. He looked exhausted. ROA.4320:05-06. After Aigheyisi was terminated, he was still sad and the loss of income

was initially hard, but he eventually did start to seem happier. ROA.4316:20-ROA.4320:07. For example, Uwa remembered a specific instance when she had to snap her fingers to get Aigheyisi to pay attention to their conversation. ROA.4316:20-ROA.4320:07. Uwa Aigheyisi further confirms the damage Aigheyisi suffered to his dignity as well as emotionally and physically. The jury saw the same, and consequently awarded the appropriate damages.

*Joshua Walker.* The harder Walker worked, the more Defendants mistreated him. ROA.3274:06-11. Walker was scared to lose his job and be forced to go back home in another state—something he badly wished to avoid. ROA.3276:03-18.. The daily unequal treatment hurt Walker. ROA.3276:19-3277:13. To be qualified for a promotion and be passed over in favor of non-Black employees was humiliating and made Walker feel hopeless and depressed. ROA.3276:19-3277:13. He was trapped. ROA.3277:04-05. Walker's depression manifested through loss of appetite and trouble sleeping. ROA.3277:11-13. Walker testified it felt surreal to actually experience racial discrimination in the workplace. ROA.3277:19-25. It was a traumatizing experience that will never leave him. ROA.3277:19-25. Even after working for Defendants, Walker

remembers the discriminatory and retaliatory treatment. ROA.3278:01-13. He is now more cautious at work and does not trust the HR department. ROA.3278:01-13. Walker now prefers to work from home rather than worrying about being discriminated against because of his skin color. ROA.3279:03-07. The jury awarded damages in proportion to the legally sufficient and trustworthy evidence of Walker's dignity and emotional distress damages.

*Michael Brown.* Defendants humiliated Brown with their discriminatory treatment. ROA.4007:04-14. Defendants took away Brown's pride and dignity. ROA.4007:04-14 Thinking about Defendants' treatment is a trigger that makes Brown want to cry. ROA.4007:04-14He could not eat. ROA.4007:15-50. After his termination, he was depressed and tried to focus and stay busy to not think about the unequal treatment by Defendants. ROA.4008:07-11. Brown was older than many of his peers and had more managerial experience. Defendants would discriminate against Brown in front of the younger workers, embarrassing him. ROA.4008:07-11. He developed migraines because of the stress, and it affected his ulcer. ROA.4008:07-11.The jury heard this legally sufficient

evidence and awarded Brown dignity damages in accordance with the evidence.

*Adewale Ashiru.* After termination, Ashiru decided to go back to being a field technician because he developed a phobia of being discriminated against based on his skin color. ROA.3919:19-ROA.3920:11. In the field, he would not be around as many people could at least feel like he was his own boss. ROA.3920:11.Defendants' treatment of Ashiru made him feel dehumanized. ROA.3920:12-25.. Defendants made him feel crazy and less than other non-Black employees. ROA.3920:12-25. The gas lighting continued, and no one listened to Ashiru when he tried to oppose his wrongful termination and lies employees made about him. ROA.3920:12-25.  With his current employer, he is the only employee who keeps the video off on his work videoconferences. ROA.3921:10-3922:04. He does not want his peers to see he is Black for fear of being discriminated against like Defendants did previously. ROA.3921:10-3922:04. He cannot stop thinking about how Defendants treated him. ROA.3921:10-3922:04. Because it was mostly Indian employees who treated him so horribly, Ashiru is afraid of new Indian people he meets, even though he knows there are good Indian

people out there. ROA.3922:19-ROA.3923:08. The jury had legally sufficient evidence to make their award for the damages to Ashiru's dignity and emotional distress.

**Brandon Price.** Price is another example of the variety of ways people respond to racial discrimination. While the Tijani brothers had no problem calling a spade a spade when they saw and experienced disparate treatment, Price had trouble discussing race. ROA.3922:19-ROA.3923:08. He does not like to talk about race but had to tell the truth on the stand. ROA.3922:19-ROA.3923:08. The jury heard the long pause as he had to gather himself before he could testify about such a difficult topic. ROA.4337:04. Price felt used, unappreciated, and lied to. ROA.4337:15-16. He was just another tool who Defendants hardly counted as a human. ROA.4336:06-4339:18. Given the substantial evidence of how Defendants treated Price and how it affected his dignity, the jury awarded appropriate damages.

**Harom Pringle.** Pringle feared being retaliated against and fired. ROA.4062:13-ROA.4069:24. He knew his manager was avoiding him, which made him uneasy at work. ROA.4062:13-ROA.4069:24. He knows from his personal experience that someone does not need to use racial

slurs to treat you differently because of race. ROA.4064:17-4065:22. He is analytical and more stoic than many of the other Plaintiffs, but he experienced the same discrimination and retaliation that affected his dignity. The jury was able to take the context of Pringle's testimony with the other evidence presented at trial and award the appropriate damages for Pringle's dignity. *See Johnson,* 7 F.4th at 403-04 (noting that a reasonable factfinder can conclude harassment based on race using context-specific factors and totality of the circumstances).

## L. The jury's award of punitive damages was not excessive.

The desire to punish can be a product of reason rather than emotion and can result from a rational deduction that such action is necessary. *Smith v. City of Seven Points, Tex.*, 608 F. Supp. 458, 465 (E.D. Tex. 1985). "The Supreme Court has articulated three factors that courts should consider in determining whether an award of punitive damages is constitutionally excessive: (1) the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct." *Lewis v. Pugh*, 289 F. App'x

767, 777 (5th Cir. 2008) (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434–35 (2001)).

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The Supreme Court has instructed courts to determine reprehensibility by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576–577. While a plaintiff may be presumed to have been made whole for his injuries by compensatory damages, punitive damages should still be awarded if the defendant's culpability is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.,* at 575; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

### 1. Reprehensibility or culpability.

Defendants actually instructed the decision maker in the layoff process to not lay off white people. This is direct evidence of discriminatory intent. The Senior Manager of Human Resources made the instruction, and she knew it was against the law. Plaintiffs also presented evidence of Defendants' repeated false accusations and setting Plaintiffs up for failure. The demeaning of Black employees was systematic. It devolved terminating each of the Black plaintiffs except for one who was recalled to be a chauffeur for engineers rather than continue as an engineer.

Defendants callously disregarded the law. The targets of the conduct were vulnerable, fearful of retaliation and having virtually no power to stop the violations. Defendants' conduct involved repeated actions rather than isolated incidents and the harm is a result of intentional malice, trickery, and deceit; not mere accident. There was evidence that Defendants acted in the face of a perceived risk that its actions would violate federal law.

### 2. The relationship between the penalty and the harm.

The penalty awarded by the jury bears a direct relationship to the harm to the Plaintiffs caused by Defendants' conduct. The jury was punishing for race discrimination and retaliation, not some other tangential reason. The case centered on discrimination and retaliation and only business practices related to those issues.

### 3. The sanctions imposed in other cases for comparable misconduct.

Punitive damages of $5 million was recently upheld in a disability discrimination case. *Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *8 (W.D. Wash. Mar. 11, 2021). A jury in North Carolina awarded $10 million in punitive damages in a race discrimination case. *David Duval v. Novant Health, Inc.*, No. 3:19-CV-624-DSC (W.D. N.C.) (case pending). A federal court in California upheld $13.5 million in punitive damages in a race discrimination case. *Diaz v. Tesla, Inc.*, No. 3:17-CV-06748-WHO, 2022 WL 1105075, at *25 (N.D. Cal. Apr. 13, 2022). And a federal court in Texas found that found $1 million in punitive damages in a Title VII case supported by the evidence but reduced it according to the statutory cap. *Edwards v. Aaron Rents, Inc.*, 482 F. Supp. 2d 803, 816 (W.D. Tex. 2006).

If the Court considers a remittitur, then a suggested amount is four times the minimum compensatory suggested of $550,000, or $2,200,000 each.

### III. The district court erred in granting judgment as a matter of law pursuant to Rule 50(a) as to Yarbrough's and Lofland's constructive discharge claims, and this Court should reinstate the jury's verdict for Plaintiffs; or, alternatively, remit the verdict.

The district court erred in granting Defendants' Rule 50(a) motion for judgment as a matter of law as to Yarbrough's and Lofland's constructive discharge claims—they presented evidence of their demotion, reduction of work responsibilities, and Defendants' threats and harassment for a jury to find that was legally sufficient for a jury to find they were constructively discharged.

To prove constructive discharge, a plaintiff must "show that 'a reasonable party in his shoes would have felt compelled to resign.'" *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 444 (5th Cir. 2011). Several factors bear on whether this standard has been met, including whether any of the following occurred: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering

harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* Moreover, the Court has emphasized that an employee is constructively discharged where the plaintiff "reasonably could have believed that his demotion was a harbinger of dismissal." *Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1028 (5th Cir. 1992).

An abundance of these factors is present here. Defendants required Lofland and Yarbrough to work in an organization made up of Indians at the top, white and Indian employees in the middle, and Black employees on the bottom. ROA.2967:02-ROA.2969:17. They suffered the experience of Defendants discriminating against and targeting Black employees. ROA.2848:03-17; ROA.2955:23-2956:22. Defendants subjected them to watch the humiliation of Black employees assigned to seats to be monitored by cameras and to be scrutinized on breaks, while Indian employees were free to come and go, doing their work in a relaxed atmosphere with their feet on their desks. ROA.2853:03-12; ROA.2956:07-2957:05. They saw discrimination in the dress code and the use of personal phones, seeing Defendants promoting Indians rather

than Black employees. ROA.2957:06-ROA.2962:19.. Defendants showed them a racially unbalanced lay off list and confirmed to him that they were not going to lay off white people. ROA.2963:11-ROA.2964:11.

Defendants began to retaliate against Lofland after he confronted the Defendants about promoting less qualified Indian employees over more qualified Black employees. ROA.2863:03-ROA.2864:02.. After speaking to other Black employees about gathering opposition to the treatment, Yarbrough was told that a manager would never forgive him for it. ROA.2865:10-ROA.2866:02. The manager then removed Yarbrough from the Quality Assurance team, demoting Yarbrough by three levels. ROA.2875:01-21. Defendants would continue to undermine Yarbrough until he quit. ROA.2877:22-2878:03.

When Lofland opposed retaliatory treatment against Yarbrough, Defendants manager threateningly told Lofland to stop talking about the issue. ROA.2866:09-17. Lofland understood this to be a threat that he could lose his job for bringing up discriminatory issues. ROA.2866:09-ROA.2867:01. When Lofland expressed his concerns about the imbalanced layoff list, Defendants began to have him train his replacement and demoted him by three levels. ROA.2873:16-

ROA.2876:24. Both Lofland and Yarbrough quit the day that they were informed of the demotion. ROA.2877:08-13.

Daily subjection to this treatment and atmosphere would be unbearable to any reasonable person. No person in the United States should be expected to endure this workplace. The Civil Rights Act of 1866 provides the right to "the enjoyment of all the benefits, privileges, terms and condition of the contractual relationship" as everyone else. 42. U.S.C.§ 1981. A reasonable person could find that continued employment where this law is violated daily would be intolerable. An employee should not be compelled to remain employed under these circumstances to bring a claim to enforce this law.

The evidence here is just as if not more substantial than in prior Fifth Circuit cases establishing a fact issue existed for potential constructive claim. In *Dediol v. Best Chevrolet, Inc.*, the Court held the denial of the plaintiff's transfer request, coupled with the "difficult—and at times volatile—relationship" between plaintiff and his manager (typified by the manager's coarse and disparaging remarks), were enough for the issue of constructive discharge to go to a jury. 655 F.3d at 444-45. And in *Stephens*, the Court found that an employer's harassment of an

employee after the employee's demotion and loss of supervisory responsibilities "could make a reasonable employee believe that he risked termination if he remained on the job." 955 F.2d at 1028.

To support its contrary conclusion, the district court cited one precedential opinion. RE.6 ROA.1377. (quoting *Jurgens v. EEOC*, 903 F.2d 386 (5th Cir. 1990)). But the facts in *Jurgens* are easily distinguished. First, the parties agreed that the demotion in question was not due to discrimination, but rather part of a non-discriminatory reorganization. *Jurgens*, 903 F.2d at 392. Second, while the plaintiff ultimately opted to retire early, he was offered a position that would have allowed him to retain supervisory duties. *Id.* at 388. Here, in contrast, Yarbrough and Lofland were demoted after complaining about racial discrimination, *and* after being told that any employee who complains will be "fired on the spot." ROA.2863:03-20..

"[A] demotion or transfer in some instances may constitute a constructive discharge." *Jurgens*, 903 F.2d at 391. This is one of those instances—Yarbrough's and Lofland's triple demotions, combined with a threat of retaliation, and ongoing harassment could be reasonably construed by an objective employee as "harbingers of dismissal."

*Stephens,* 955 F.2d at 1027. Under the Court's precedent, this evidence is more than sufficient for a jury to conclude that Yarbrough and Lofland were constructively discharged.

## IV.    Alternatively, this Court should remand for a new trial.

In the event this Court remands this action for a new trial, it should (1) reverse the district court's summary judgment against Plaintiffs on their hostile work environment claim; and (2) reverse the district court's Rule 50(a) order dismissing Plaintiffs' claims against SlashSupport.

### A. This Court should reverse the district court's summary judgments against Plaintiffs on their hostile work environment claims and allow them to try those claims on remand.

All Plaintiffs[5] challenge the district court's dismissal by summary judgment of their Section 1981 claims for a hostile work environment.[6]

Plaintiffs establish a prima facie case of discrimination and survive summary judgment on their hostile work environment claims, by showing: (1) they are members of a protected class; (2) they suffered unwelcome harassment; (3) the harassment was based on their

---

[5]    Except Lofland, who did not assert a claim for hostile work environment.

[6]    The McDonnell Douglas standard applies at the summary judgment stage. *See, e.g., Shiyan Jiang v. Tex. Comm'n on Envtl. Quality*, 321 F. Supp. 3d 738, 745–46 (W.D. Tex. 2018).

membership in a protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. *Johnson v. PRIDE Industries, Inc.*, 7 F.4th 392 (5th Cir. 2021).

As noted by the district court below, Glow challenges the third and fourth elements of Plaintiffs' hostile work environment claims: whether the alleged harassment was based on race; and whether the alleged harassment affected a term, condition, or privilege of employment. RE.4 ROA.1147. The lower court erred by granting summary judgment on those elements, despite acknowledging disputed material facts in the record. RE.4 ROA.1131 (acknowledging "the parties dispute many facts surrounding the cameras").

**1. Element three – Plaintiffs offered evidence that created a genuine issue of material fact regarding harassment based on race.**

The district court granted summary judgment by concluding Plaintiffs offered no evidence they were intentionally subjected to harassment because of their race. RE.4 ROA.1148. That conclusion ignores a dense summary judgment record detailing repeated bullying,

insults, slights, humiliation, degradation toward, withholding of privileges from, and heightened scrutiny of Black workers—both in isolation and when compared to non-Black workers. And those are just the intangible effects of Defendants' discrimination. There were tangible effects too—Defendants withheld promotions from Black workers and—when necessary to elevate other people, including in one instance the Indian supervisor's unqualified girlfriend—demoted Black workers.[7] Plaintiffs' only distinguishing feature, compared to others treated more favorably, is their race.

Despite that axiom, the district court concluded that, even if these actions happened, there was no proof that Defendants' actions were racially motivated. RE.4 ROA.1148. Of course they were. The issue with the district court's application of law to the facts is that, in effect, it dismissed Plaintiffs' claims because no one looked at Plaintiffs and outright said, "I am discriminating against you because you are Black."[8] But that kind of direct evidence of discrimination is not required to

---

[7] *See infra*, chart containing summary judgment record citations, rows 7 & 8 below.

[8] To point, the district court suggests an express statement of racial animus is the only objective evidence that can establish a hostile work environment. *See* RE.4 ROA.1149.

substantiate a claim for hostile work environment. Rather, "[a]s direct evidence of discriminatory intent is rare, an employee ordinarily proves her claim through circumstantial evidence." *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022) (citing *Scales v. Slater*, 181 F.3d 703, 709 (5th Cir. 1999)).

Acknowledging these realities, this Court has held that the context of an alleged pattern of harassment allows a court to infer harassment based on a protected status, even if no explicit comments are made about the protected status. *EEOC v. WC&M Enters., Inc.*, 496 F.3d 398-99 (5th Cir. 2007) (quoting parenthetically *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81-82 (1998)) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Here, the circumstantial evidence establishes Defendants discriminated against Plaintiffs because they are Black. The record screams the familiar adage, "one of these things is not like the others," as Black people were treated fundamentally differently—and adversely—compared to Indian and white people.

First, the white HR director instructed Pauddar, an Indian manager, "don't lay off any white people." RE.4 ROA.1140, 48 (discussing Pauddar's instruction to Pauddar). The negative implication of that instruction, *i.e.*, the statement it makes without saying it directly, is "fire only people who are not white." That is classic discrimination based on race. Appellees and the district court qualify that statement with the fact that Pauddar responded, "I am not making any decisions based on somebody is white or black [sic]." RE.4 ROA.1140, 48. But the fact that no tangible hiring and firing decisions were made *in direct response to Cahoon's instruction* is unhelpful to Plaintiffs if the discrimination has other intangible effects and is seen and felt elsewhere in the company. It was.

Rather, this case, like any hostile work environment case, is one based on the cumulative effect of a thousand cuts, rather than on any one of Defendants' actions. *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017). Those thousand cuts included the following:

| Fact: | Record Citation: |
| --- | --- |
| 1. Defendants grouped the Black workers together in | ROA.906 (<u>Ologban</u> testifying Nigerians "all sat together . . . at the same room."); ROA.1014 |

| | | |
|---|---|---|
| | specific rooms to complete their job duties based on the color of their skin. | (<u>Pringle</u> testifying "we weren't allowed to sit together and like be moving in and out of each other's offices like that . . . it was definitely like an isolated type of situation[.]"). |
| 2. | Defendants did not allow the Black workers to use their personal cell phones because of the color of their skin—even when they needed to communicate with the field technicians with their cell phones—but white and Indian workers were allowed to use their personal cell phones. | ROA.981 (<u>Samuels</u> testifying that white people, such as "Jeff and Jennifer" were allowed to use their cell phones and weren't "chastised or spoken to"); ROA.891 (<u>Lofland</u> testifying Sandeep treated people "differently" and he treated "black employees much more harsher [sic] than Indian counterparts. He would, for example, [give] small fractions for like being on your phone . . . his friends or people of Indian descent he wouldn't enforce that at all."). |
| 3. | Defendants did not allow the Black workers the same breaks as white and Indian workers. | ROA.939 (<u>Paul Tijani</u> testifying Indian people were allowed to "take a smoke break. All they do is take a smoke break, come back, take a smoke break."); ROA.891 (<u>Lofland</u> testifying Sandeep treated "black employees much more harsher [sic] than Indian counterparts. He would, for example small fractions [sic] . . . like getting up from your desk. He told them they all had to tell their bridge manager where they are going, how long they are going to be gone, time and stuff . . . his friends or people of Indian descent he wouldn't enforce that at all. They would take, you know, five to eight smoke breaks, 10 minutes apiece with no issue."); ROA.1022 (<u>Walker</u> testifying "Defendants did not allow the Black workers the same breaks as whites and Indians because of the color of our skin."); ROA.1132-38 (opinion referencing that white and Indian workers were permitted to take frequent breaks). |
| 4. | Defendants installed cameras in the rooms | ROA.982, (<u>Samuels</u> testifying Appellees placed Black workers "under the cameras or right in |

| | | |
|---|---|---|
| | mostly populated by Black workers, but not in rooms populated by mostly white or Indian workers. | front of a manager that would be in the room."); ROA.1022 (<u>Walker</u> testifying "Defendants installed cameras in the rooms mostly populated by Black workers, but not in rooms populated by mostly white or Indian workers because of the color of our skin."). |
| 5. | Defendants constantly spoke to Black workers in a condescending and manipulative tone. | ROA.1139(referencing <u>Ologban</u> testimony that Silat talked to him in a condescending manner); ROA.934 (<u>Paul Tijani</u> testifying that Sandeep was "manipulative" and would "bully him"); ROA.1022 (<u>Walker</u> testifying "Defendants constantly spoke to black workers in a condescending and manipulative tone"). |
| 6. | Defendants required Black workers to clean up dishes after white and Indian workers. | ROA.924-25 (<u>Paul Tijani</u> testifying "almost every night, you know, he always want to tell me to go clean it up . . . But this guy always want to tell me to clean the kitchen space" and that "It was almost every night to the point that I felt like it was part of my duty."). |
| 7. | Defendants denied qualified Black workers promotions and instead hired white and Indian workers to fill those positions. | ROA.1000 (<u>Vicks</u> testifying she complained "we weren't receiving the promotions and things that we were supposed to – that we should have been receiving for our jobs."); ROA.897 (<u>Lofland</u> testifying that he recommended Joshua Walker for promotion because he was excelling but Mohammed Uddin, who regularly yelled at workers on the phone, was promoted instead); ROA.846-48 (<u>Ashiru</u> testifying four or five Indian or white people that Ashiru trained with were promoted over him). |
| 8. | Defendants demoted qualified Black workers and instead hired white | ROA.1132 (referencing <u>Yarbrough's</u> testimony that he was demoted from his position and replaced with Silat's girlfriend); ROA.860-61 (<u>Green</u> testifying "The reason I was told for the demotion that was, you know going throughout |

| | | |
|---|---|---|
| | and Indian workers to fill those positions. | the company was due to me getting an ear or hearing about me getting a petition to submit to management on what was actually going on. . . We had got up to about 30 people on the list prior to the demotion."); ROA.931 (<u>Paul Tijani</u> testifying "Mohammed openly said it in the room . . . 'I can promote and, like, demote and get anybody fired."); ROA.1022 (<u>Walker</u> testifying "Defendants demoted qualified Black workers because of the color of our skin and instead hired white and Indian workers to fill those positions."). |
| 9. | Defendants restricted training offered to Black workers, while offering extra training to white and Indian workers. | ROA.891 (<u>Lofland</u> testifying "They would take, you know, five to eight smoke breaks, 10 minutes apiece with no issue. Same thing. [Black workers[ did something wrong he would discipline them. Some of Indian descent or white for that matter he would train them instead."); ROA.1022 (<u>Walker</u> testifying "Defendants restricted training to its Black workers because of the color of our skin while allowing white and Indian workers extra training."). |
| 10. | Defendants gave more sites and work assignments to its Black workers than the white and Indian workers. | ROA.939 (<u>Peter Tijani</u> testifying Dan "asked me how many sites do I have. And I tell him, you know, sometimes I get four. Sometimes I get six. And he was like: No. You shouldn't get more than one or two at the most . . . The white folks up there and the Indians, they were getting one or two sites."); ROA.1040 (<u>Brown</u> testifying "They always treated me this way because I am Black and because I never ever saw them do this to a white person and I never ever [saw] them treat an Indian person this way. . . They would always try to find a way to work me like I was a SLAVE especially Sandeep and Mohammed Silat did when I worked Overtime to help them on their 3rd shift team."); ROA.1022 (<u>Walker</u> testifying "Defendants gave more sites and work |

| | |
|---|---|
| | assignments to its Black workers than the white and Indian workers because of the color of our skin."). |
| 11. Defendants yelled, disciplined, verbally abused, and falsely accused Black workers of making mistakes, even after it was proven that the Black workers did not commit such mistakes, all while not treating the white or Indian workers in the same manner. | ROA.817 (Aigheyisi testifying that Mohammed falsely accused a Black worker of "threatening" him physically when "everybody else saw it. There was no threatening words . . . But because he was the lead and he had Sandeep's ear, the other person got written up even though everybody there told him that's not true, what he reported was false."); ROA.758 (Paul Tijani reporting via email that Sandeep reprimanded him for going to the wrong site that Mohammed provided to him and that Sandeep refused to believe, accept, or review Tijani's recitation of messages and communications regarding the site location.); ROA.765 (Peter Tijani reporting via email that he was fired because Mohammed sent him to the wrong site.); ROA.951 (Peter Tijani testifying a tier 2 yelled at him about an incorrect site location Tijani received from Mohammed); ROA.897 (Lofland testifying about Uddin being promoted despite the fact that he would yell at people on the phone); ROA.987 (Samuels testifying he was threatened with termination"); ROA.998 (Vicks testifying she was verbally warned by Sulat and Pauddar more than three times for being in the restroom or taking a "quick" break); ROA.968 (Price testifying "everyone gets questioned. But it's one thing when a person's kind of, like, consistently proving that they're right, you're sitting there saying whoa. . . You might want to verify that he's wrong before you go up and approach him and say he's wrong."); ROA.1022 (Walker testifying "Defendants yelled, disciplined, verbally abused, and falsely accused Black workers even after it was proven that the |

| | | |
|---|---|---|
| | | Black workers did not commit such mistakes, and Defendants did not treat the white or Indian workers this way."). |
| 12. | Because Defendants gave Black workers more sites than the white and Indian workers, or wrong sites that white and Indian workers did not receive, Black workers were forced to work overtime to complete their tasks but were not paid accordingly. | ROA.939 (Paul Tijani testifying he had to work more hours than Indian or white workers to make sure he was finishing his work because "they're overworking" him"); ROA.911-12 (Ologban testifying they would rush him through his work, he felt "bottled up" with too much work; and that he would receive "up to six sites" and be expected to finish those sites."); ROA.1023 (Walker testifying "Because the Defendants gave its Black workers more sites than the white and Indian workers or wrong sites that white and Indian workers did not receive, it forced us Black workers to work overtime to complete the tasks and we were denied overtime pay."). |
| 13. | Defendants denied some Plaintiffs the option of overtime while allowing white and Indian workers to work overtime. | ROA.846-47 (Ashiru testifying Black workers were denied the right to receive overtime). |
| 14. | Defendants did not allow Black workers of Nigerian descent to wear their native dress, but they allowed other workers to wear their native dress. | ROA.914 (Ologban testifying that Silat said "you should not wear that shit to work anymore" when a Nigerian worker wore a Nigerian traditional shirt.); ROA.845 (Ashiru testifying that Indian ladies came with their native dress "so when I came in for the first time, he told me I shouldn't put this on every day."); ROA.1023 (Walker testifying "Defendants did not allow Black workers of Nigerian descent to wear native dress while allowing its Indian workers to wear native dress."). |

| | |
|---|---|
| 15. Silat used racial slurs against Black workers. | ROA.850 (<u>Ashiru</u> testifying that Ashiru heard people using racial slurs "against my colleagues, yeah. Several times[.]"). |
| 16. Defendants' night shift team lead would walk around making videos of the Black employees but not employees of their races. | ROA.998 (<u>Ologban</u> testifying "Mohammad made it known that he has video of us" and saying "no" he was not making videos of other employees"); ROA.1023 (<u>Walker</u> testifying "Defendants' night shift team lead would walk around making videos of the Black employees but not employees of other races."). |
| 17. Defendants threatened Plaintiffs. | ROA.758 (<u>Paul Tijani's</u> discrimination complaint reciting Sandeep threatening to fire Tijani over mistakes Silat made); ROA.1139 (referencing <u>Ologban's</u> testimony Silat threatened he could fire them at any time); ROA.987 (similar testimony by <u>Samuels</u>); ROA.951 (<u>Peter Tijani</u> testifying about being yelled at); ROA.861 (similar testimony by <u>Green</u>); ROA.897 (similar testimony by <u>Lofland</u>); ROA.1023 (<u>Walker</u> testifying "Defendants threatened Black workers that it would fire us."). |

The district court considered *some* of those facts in isolation and completely ignored others. RE.4 ROA.1147-48 (isolating and discussing, for example, the absence of specific examples of racial slurs). That was error. *See Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) ("[A]ll of the circumstances must be taken into consideration"). Specifically, facts the district court ignored in granting summary judgment include:

- Black workers were the only ones punished—and, in some instances, fired—for the mistakes of their Indian superior, Silat;[9]

- Nigerian people were the only category of people not permitted to wear their native dress (Muslim women were permitted to do so);[10]

- All the white workers had privileges Black workers did not— the ability to use their cell phones while working;[11] and

- Defendants required Black workers to clean up dishes after white and Indian workers.[12]

Nowhere are those facts discussed in the opinion below.

Perhaps most telling (and troubling) is that the district court ignored evidence related to the recording of Black people on cameras. *See* RE.4 ROA.1147-51. The district court does not discuss those facts at any point while analyzing element three of a hostile work environment claim. That omission is critical. As the district court acknowledged elsewhere, "the parties dispute many facts surrounding these cameras." RE.4 ROA.1131. If Defendants installed cameras to spy on Black workers only,

---

[9] *See infra*, chart containing summary judgment record citations, row 11.

[10] *See infra*, chart containing citations, row 14.

[11] *See infra*, chart containing citations, row 2. "Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010).

[12] *See infra*, chart containing citations, row 14.

that fact would tend to make discriminatory intent more likely. *See* FED. R. EVID. 401. Thus, that fact is relevant. *Id.* And that fact is "material" because its resolution could affect the outcome of the action. *Poole*, 691 F.3d at 627. Where analysis of a hostile work environment claim requires that "all of the circumstances must be taken into consideration" (*Ramsey*, 286 F.3d at 268), the district court cannot ignore evidence that management was so distrustful of Black people that it filmed them and only them.

Reviewing the entire record, Plaintiffs at least created a fact issue as to whether they were discriminated against on the basis of their race. That much becomes even more clear upon comparison to similar cases. For example, in *Johnson v. Halstead*, this Court found a hostile work environment based on a police officer's claims of "false accusations of wrongdoing, name calling, campaigning to turn others against [him], encouraging [his] peers and direct reports not to work with [him], or for [him] thereby marginalizing and undermining his supervisory effectiveness." 916 F.3d 410, 418 (5th Cir. 2019). The Court emphasized that "racial intimidation" interfered with the Plaintiff's work performance. *Id.* The same is true here. Plaintiffs were intentionally set

up to fail because of their race.[13] They were falsely accused of wrongdoing.[14] They were distrusted—to the point they were constantly surveilled—and denied basic privileges.[15] No other class of person in the Defendants' caste system was treated in that manner.

In sum, Plaintiffs acknowledge they must carry a high burden on a hostile work environment claim. It was improper, however, for the district court to cherry-pick facts from the record, ignore material facts Plaintiffs offered—including facts the district court acknowledged were disputed—and demand (by implication) direct evidence that Plaintiffs were treated differently because of their race. That is not the standard. Plaintiffs' evidence created a genuine issue of material fact on the issue of whether they were discriminated against because they were Black. They were.

---

[13] *See infra*, chart containing citations, row 11 (summarizing accounts of Plaintiffs being sent by Silat to incorrect work sites and then reprimanded or fired for it).

[14] *See, e.g., id.*

[15] *See infra*, chart containing citations, rows 2, 3, and 4.

## 2. Element four – Plaintiffs offered evidence that creates a genuine issue of material fact regarding harassment that affected a term, condition, or privilege of employment.

A "term, condition, or privilege" of employment is affected when the harassing conduct is severe or pervasive enough to create an objectively hostile or abusive working environment. *Shepherd v. Comptroller of Public Accounts,* 168 F.3d 871, 874 (5th Cir.1999); *Pfeil v. Intercom Telecommunications*, 90 F.Supp.2d 742, 749 (N.D. Tex. 2000). The Court has noted that "the test—whether the harassment is severe or pervasive—is stated in the disjunctive." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 745 (2023) (internal citations omitted).

"An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Id.* (citing *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434–35 (5th Cir. 2005)); *see also, e.g.*, *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) (allegation that supervisor directly called subordinate a "Lazy Monkey A** N*****" in front of his fellow employees was enough).

"The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Id.* Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Id.* (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).

Harassment is sufficiently "severe or pervasive enough" when it is "objectively hostile or abusive"—meaning, "an environment that a reasonable person would find hostile or abusive"—and is subjectively perceived by the victim as abusive. *Johnson*, 7 F.4th at 400 (5th Cir. 2021) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Supreme Court has "emphasized . . . that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

The objective inquiry, moreover, requires that the Court consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,

or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Johnson*, 7 F.4th at 400 (citing *Harris*, 510 U.S. at 23). "[N]o single factor is required." *Id.*

### a. A question of fact exists regarding whether Defendants' harassment was frequent.

The district court criticized Plaintiffs for being "generally vague" about the frequency of Defendants' harassment. RE.4 ROA.1150. It is no surprise Plaintiffs could not describe dates of the harassment—harassing acts happened all the time. Samuels, for instance, was asked in his deposition, "have we discussed all the ways that you claim [Silat] was discriminatory against you based on your race?" He responded: "I don't think I'm able to recall all the ways, because it was so frequent." RE.4 ROA.988.

Part of the reason Plaintiffs were not more specific in their depositions about the frequency of harassment is because they suffered a number of harassing acts daily.[16] These include prohibition from using

---

[16] Walker and Yarbrough, at least, noted that "the unwelcome harassment to us Black workers began almost as soon as we finished orientation and lasted the entire time of our employment. " ROA.1021 (Walker); ROA.1026-27 (Yarbrough).

their cell phones when white and Indian workers could do so;[17]
prohibitions on taking breaks when Indians took 10-minute smoke
breaks whenever they wanted;[18] being placed immediately in front of
cameras, recorded, and surveilled;[19] and being required to do dishes when
people of other races were not—which Paul Tijani testified happened
"almost every night."[20]

These assertions raise a genuine issue of material fact sufficient to
allow the jury to determine the frequency of Defendants' harassment.

### a. A question of fact exists regarding whether Defendants' harassment was severe.

The district court recited only two facts in the record in concluding
the conduct was not severe: (1) the fact that Black employees were
grouped together in rooms, and (2) the fact that Black employees were
recorded on camera. RE.4 ROA.1150-51. The district court wholly ignored
other facts in the record.

---

[17] ROA.981 (Samuels testifying); ROA.891 (Lofland testifying); ROA.1021 (Walker testifying); ROA.1139 (Ologban's allegation).

[18] *See infra*, chart containing summary judgment record citations, row 3, above.

[19] *See infra*, chart containing summary judgment record citations, row 4, above.

[20] ROA.924-25 (Paul Tijani testifying "almost every night, you know, he always want to tell me to go clean it up . . . But this guy always want to tell me to clean the kitchen space," and that "It was almost every night to the point that I felt like it was part of my duty.").

The record actually reflects Defendants' leadership used racial slurs. ROA.850 (Ashiru testimony). Defendants yelled at Plaintiffs,[21] spoke to Plaintiffs in condescending tones,[22] cursed at Plaintiffs,[23] bullied Plaintiffs,[24] falsely accused Plaintiffs of wrongdoing,[25] and threated[26]—and actually did—terminate[27] Plaintiffs. Those facts are evidence of verbal abuse. Ologban recalls Silat threatening to refuse to let him or the other Black employees leave. ROA.909. Paul Tijani was shaking and "almost cried" after one outburst in which Pauddar threatened to fire Tijani

---

[21] ROA.861 (Green testimony); ROA.951 (Peter Tijani testimony).

[22] ROA.1139 (Ologban); ROA.934 (Paul Tijani testimony); ROA.1022 (Walker testimony).

[23] ROA.914 (Ologban testimony that Silat said "you should not wear that shit to work anymore" when a Nigerian worker wore a Nigerian traditional shirt.).

[24] ROA.934 (Paul Tijani testifying).

[25] ROA.817 (Aigheyisi testifying); ROA.758 ROA.765 (Peter Tijani report); ROA.910 (Ologban testifying); ROA.954 ROA.998 (Vicks testifying); ROA. 968 (Price testifying); ROA.1022 (Walker testifying "Defendants yelled, disciplined, verbally abused, and falsely accused Black workers even after it was proven that the Black workers did not commit such mistakes, and Defendants did not treat the white or Indian workers this way.").

[26] ROA.987 (Samuels testifying he was threatened with termination"); ROA.758 (Paul Tijani's discrimination complaint reciting Sandeep threatening to fire Tijani over mistakes Silat made); ROA.910 (Ologban testifying Silat threatened he could fire them at any time when Ologban raised a concern over a camera location); ROA.861 (similar testimony by Green); ROA.897 (similar testimony by Lofland); ROA.1023 (Walker testifying "Defendants threatened Black workers that it would fire us.").

[27] ROA.1138 (Aigheyisi); ROA.1137 (Ashiru); ROA.1134 (Brown and Paul Tijani); ROA.1135 (Peter Tijani).

after falsely accusing Mr. Tijani of doing his job incorrectly, even after written communications disproved Pauddar. ROA.758 Silat acknowledged his abuse, stating "I'm an asshole and I am about to even be more of an asshole." ROA.759.

The facts here align with those of *Pfau v. Mnunchin*. There, the court found a co-worker who exercised supervisory actions outside of his authority and duties along with five specific actions of that co-worker's harassment plausibly creates a hostile work environment. No. 1:18-CV-422-RP, 2019 WL 2124673, at *1 (W.D. Tex. May 15, 2019). The court found interrupting, ranting, using a "demanding tone," telling someone to quit while clenching fists, and punching one fist into another repeatedly constituted pervasive harassment.

The vast majority of that conduct is present here—and the record contains many additional instances of harassment not seen in the *Pfau* case—discriminate recording on cameras, unfair expectations to do dishes, disparate privileges (breaks and cell phones), unequal training, discriminatory promotion of unqualified whites and Indians overqualified Black workers—the list goes on.

The district court's analysis of the severity of the harassment is another instance of cherry-picking from the record and ignoring critical facts. When reviewing the totality of the circumstances, Plaintiffs' assertions raise a genuine issue of material fact sufficient to allow the jury to determine the frequency of Defendants' harassment.

### b. A question of fact exists regarding whether the harassment was humiliating to Plaintiffs.

On this point, the district court began its analysis by noting an absence of physical threats. That absence is not dispositive. *Johnson*, 7 F.4th at 400 ("no single factor is required."). Then, the district court all but acknowledged the conduct *was* humiliating, but then backtracked by contending that Plaintiffs were not humiliated because of their race. ROA.1152 ("Price testified that . . . he was forced to chauffer other employees around. This incident might be humiliating, but Price provides no explanation for his subjective belief that it was based on his race."). That analysis conflates elements three and four. And, again, it is unsurprising no one at Glow looked at Plaintiffs and said "I am humiliating you because you are Black."

Many of the Plaintiffs testified they felt humiliated or worse.[28] And setting aside Plaintiffs' subjective beliefs, the conduct at issue is objectively humiliating. To humiliate means "to reduce someone to a lower position in one's own eyes or others' eyes."[29] Notably, all the incidents described in the record occurred publicly, i.e. in front of others.[30] That means that, in front of others, Defendants were treating Black workers like they were less. Less deserving of basic privileges than people of other races.[31] Less trustworthy.[32] Less competent.[33] Less valuable as engineers.[34] Less worthy of the company's investment.[35]

---

[28] *See, e.g.*, ROA.833 (Aigheyisi testifying the harassment "affected, you know, my dignity just as a person making me feel less. I know he wasn't more than me or he wasn't worth more than me, but after I left there, it affected me."); ROA.1040 (Brown testifying "They took away my dignity and humiliated [me]. And it was so intimidating and degraded my character as a Black man.").

[29] https://www.merriam-webster.com/dictionary/humiliate.

[30] *See infra*, chart containing summary judgment record citations, row 1 above (testimony regarding the fact that Defendants' employees worked in large rooms that sat groups of people).

[31] Examples include not allowing Black workers to take breaks, use their cell phones, not allowing Black workers to watch movies when their work was finished.

[32] Examples including placing Black workers in front of cameras, calling Black workers (and only Black workers) if they were seen on camera leaving their desks for only a moment.

[33] Examples including placing Black workers in front of cameras.

[34] Black people were charged with doing the dishes and driving their Asian and white coworkers around.

[35] Examples include withhold training, withholding promotions, and demoting Black workers to make room for less qualified white and Indian workers.

Being treated, in front of others, as less is objectively humiliating. When reviewing the totality of the circumstances, Plaintiffs' assertions raise a genuine issue of material fact sufficient to allow the jury to determine whether they suffered humiliation—they did.

### c. A question of fact exists regarding whether the harassment interfered with their work performance.

On this point, the district court did not adopt the correct analysis. The proper inquiry "is not whether work has been impaired," but whether a reasonable juror could conclude that [plaintiff's] work conditions were discriminatorily altered." *Harris*, 510 U.S. at 24 (J. Scalia, concurring).

Defendants' discriminatorily altered Plaintiffs' work conditions. Quite literally, part of the harassing conduct was ensuring Plaintiffs could not competently perform their jobs by giving them misinformation and then reprimanding them for struggling.[36] Several Plaintiffs had to stay after hours to complete their work, but were refused overtime pay, *i.e.*, compensation, for that work.[37] The harassment affected Plaintiffs mentally and made completing tasks more difficult. *E.g.*, ROA.917 (Ologban); ROA.932 (Paul Tijani).

---

[36] *See infra*, chart containing summary judgment record citations, row 10 above.

[37] *See infra*, chart containing summary judgment record citations, rows 10, 12 above.

And Defendants formally disciplined several Plaintiffs. *E.g.*, ROA.893 ROA.1138 (referencing Aigheyisi's Performance Improvement Plan for similar conduct as that of white and Indian employees); Defendants verbally disciplined the Plaintiffs who did not receive a formal write up or performance improvement plan. ROA.817 (Aigheyisi); ROA.910 (Ologban); ROA.954 (Peter Tijani); ROA.858 (Green); ROA.897 (Lofland); ROA.987 (Samuels); ROA.998 (Vicks); ROA.968 (Price); ROA.758-79 (Paul Tijani).

Defendants ultimately terminated the Plaintiffs' employment[38] or made the conditions so unbearable they had no other option but to quit. That is the ultimate interference with an employee's job performance. When reviewing the totality of the circumstances, Plaintiffs' assertions raise a genuine issue of material fact sufficient to allow the jury to determine Plaintiffs' work conditions were discriminatorily altered.

In sum, Plaintiffs have raised genuine issues of material fact on their hostile work environment claims that would allow a reasonable jury

---

[38] ROA.1138 (Aigheyisi); ROA.1137 (Ashiru); ROA.1134 (Brown and Paul Tijani); ROA.1135 (Peter Tijani).

to find in their favor. They ask the Court to reverse the lower court and remand for a new trial as to those claims.

## B. This Court should reverse the district court's Rule 50(a) order and allow Plaintiffs to try their claims against SlashSupport on remand because it and Glow are an integrated enterprise.

At trial, Plaintiffs presented ample evidence that the operations of Glow and [SlashSupport], Glow's parent company, were so intertwined that they constituted either a single "integrated enterprise,"[39] Accordingly, the Court incorrectly held [SlashSupport] did not employ Plaintiffs and cannot face liability in this action. *See* RE.6 ROA.1371-72,

SlashSupport directed key Glow decisionmakers, instituted a bevy of workplace policies at Glow, and directed persons employed by Glow to hold themselves out to the public as [SlashSupport] employees. Nevertheless, the district court nonetheless dismissed SlashSupport and held "no reasonable jury could find . . . that SlashSupport could be considered Plaintiffs' employer" under either an integrated employer or

---

[39] At trial, because of the confusion created by CSS Corp. as to its identity, the parties stipulated that CSS Corp. was incorrectly named as a defendant and that SlashSupport was in fact Glow's parent company. The parties agreed to substitute SlashSupport for CSS Corp. RE.6 ROA.1372 n.1. The district court accordingly "treated evidence regarding CSS Corp. as evidence regarding SlashSupport." *Id.* Thus, for clarity and simplicity, Plaintiffs' references to "SlashSupport" encompass evidence regarding both CSS and SlashSupport.

joint employer theory. RE.6, ROA.1374, 76.. This was error. Under the fact-intensive tests that govern whether organizations are "integrated enterprises," the jury had sufficient evidence to support a finding that [SlashSupport] is a proper defendant in this case.

Under certain civil rights laws, including Section 1981, "distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise." *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983). Determining whether two companies constitute an "integrated enterprise" is a factual inquiry guided by four key factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.*

The second factor—joint control of labor relations—is the "most important factor." *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 928 (5th Cir. 2021). Plaintiffs introduced substantial evidence showing that [SlashSupport] controlled Glow employees charged with handling labor relations issues. For example, Deb Cahoon, Glow's Head of Human Resources (the most senior human resources position in the United States), reported directly to executives at [SlashSupport].

ROA.3206-08, 3210. She testified that [SlashSupport] "had a direct line to" her and "direct control over" her. ROA.3212. [SlashSupport] also installed a senior executive at Glow's headquarters in Richardson, Texas who was "responsible" not only for HR, but "for everything, [including] operations [and] sales." ROA.3209. And lest there be any doubt about which corporation directed labor relations, Cahoon—like all other Glow HR employees—represented herself both internally and publicly as an employee of [SlashSupport], not Glow. ROA.3158. [SlashSupport]'s control of Glow's HR personnel is critical, as much of Defendants' discrimination emanated from HR. For example, when Pauddar learned certain employees would be signing a petition to protest Glow's discriminatory treatment of Black employees, he said he would speak with Cahoon to ensure that anyone who complains is "fired on the spot." ROA.2863. And it was Cahoon that directed Pauddar, "don't lay off any white people." ROA.2872.

The remaining factors—interrelation of operations, common management, and common ownership—also weigh in favor of finding an integrated enterprise:

***Common ownership.*** Glow is a wholly owned subsidiary of [SlashSupport]. RE.6 ROA.1372 n.1. [SlashSupport] and Glow have overlapping board members, yet [SlashSupport]'s corporate representative could not say precisely which persons comprised Glow's board, nor could they point to any operating agreement delineating rights and responsibilities between the two entities. *Cf.* ROA.4248 (Defendants' counsel stating during argument that SlashSupport's corporate representative did not have the requisite knowledge to answer questions about corporate structure). Such an informal arrangement suggests that Glow was not meaningfully distinct from [SlashSupport]. *Cf. W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994).

***Common management.*** Glow's top HR executive reported directly to [SlashSupport] management, and [SlashSupport] stationed an executive at Glow's headquarters to oversee and manage the operations.

***Interrelation of operations.*** [SlashSupport] was enmeshed in every aspect of Glow's operations. [SlashSupport] (as CSS) controlled Glow's Richardson, Texas office; Glow's emails; Glow's benefits, handbooks, guidelines, and policies, including surveillance policies; and Glow's HR.

ROA.3211-12; 3154-59. Glow employees were all issued [SlashSupport] email addresses. Glow's "employee handbooks" covering all workplace policies were all issued to Glow by [SlashSupport], and prominently emblazoned with ["SlashSupport"] across the covers. ROA.3158-60, 3163-64, 3211-12. As one member of Glow's HR team conceded, [SlashSupport] "had the authority . . . to tell you how to present yourself to the public." ROA.3155. And Glow employees were instructed to hold themselves out to the public as [SlashSupport] employees. ROA.3156. Case in point: upon being hired, Yarbrough received a welcome email reminding him that the "moment you begin working here, you become . . . an integral part of [SlashSupport] and its future." ROA.3166. The email made no reference to Glow.

Far less evidence is needed to create a triable fact concerning the existence of an integrated enterprise. In *Trevino*, for example, the Court held that the "evidence [was] clearly" sufficient to send the question to a jury where, like here, employees of the defendant corporation considered themselves "*de facto* employees" of the related corporation, and where employees at the related corporation were able to get their relatives hired at the defendant corporation. 701 F.2d at 404 (emphasis original). Unlike

here, there was no evidence in *Trevino* that employees charged with labor relations reported to the related corporation, or that the related corporation installed an executive at the defendant's headquarters to oversee "everything" including HR, "operations, [and] sales," or that the related corporation was setting the defendant company's workplace policies. ROA.3159-60, 3163-64, 3209, 3211-12.

Despite the evidence, the district court concluded that "there is no evidence that [SlashSupport] had any involvement in Glow's daily employment decisions." RE.6 ROA.1374. But the district court's order, which does not cite *Trevino*, never explained how this conclusion can be squared with ample evidence showing that Glow employees (including those charged with making employment decisions) reported to and were overseen by [SlashSupport] executives.

The Court should accordingly reverse the district court's grant of Glow's JMOL motion and direct the court to amend the judgment to make [SlashSupport] jointly and severally liable for the damages award.

## C. This Court should reverse the district court's exclusion of "me-too" evidence as cumulative.

At trial, Plaintiffs offered four witnesses' testimony in support of their retaliation claims. Specifically, Plaintiffs offered that testimony for

two purposes: (1) as evidence of the witnesses' observations of Defendants' treatment of Plaintiffs; and (2) as evidence that Defendants treated the witnesses like they treated Plaintiffs. RE.8 ROA.3622-23. The Court only allowed Green to testify as to two limited issues (RE. 8ROA.4146) and excluded the testimony of Vicks, Samuels, and Ologban. RE. 8 ROA.4194-96.

That exclusion of testimony was an abuse of discretion. Courts in this circuit allow plaintiffs to present "me too" evidence in discrimination cases. *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 774-75 (5th Cir. 2009) (non-party employee testimony concerning alleged sex discrimination relevant to proof of employer's "plan, motive, knowledge, and absence of mistake or accident."); *Hitt v. Connell*, 301 F.3d 240, 249-50 (5th Cir. 2002) (non-party employee testimony concerning employer's discrimination and retaliation relevant to proof of employer's motive in discharging the plaintiff); *Pickney v. Diamond Offshore Services Ltd.*, No. CV H-18-4545, 2022 WL 889035, at *10 (S.D. Tex. Mar. 25, 2022).

This Court should reverse the lower court's exclusion of Plaintiffs' "me-too" evidence and remand with instructions such evidence is admissible.

## CONCLUSION AND PRAYER

Plaintiffs request this Court:

1. Reverse the summary judgment dismissing the race discrimination and retaliation claims of Green, Vicks, Price, Ologban, and Samuels; and

2. Reverse the district court's Rule 50(b) order vacating the jury's verdict;

3. Reverse the district court's Rule 50(a) order as to Yarbrough's and Lofland's constructive discharge claims; and

4. Reinstate (or remit) the jury's verdict.

Alternatively, Plaintiffs request this Court reverse the district court's Rule 50(b) order and remand this matter for a new trial, with instructions that:

1. Plaintiffs may introduce "me-too" evidence the trial court excluded;

2. Plaintiffs may try their hostile work environment claims the district court erroneously dismissed by summary judgment;

3. SlashSupport is a proper party.

Plaintiffs request all other legal and equitable relief to which they are entitled.

Dated: November 20, 2024        Respectfully submitted,


*/s/ Brian Sanford*
**Brian Sanford**
Texas Bar No. 17630700
bsanford@sanfordfirm.com
**Elizabeth "BB" Sanford**
Texas Bar No. 24100618
esanford@sanfordfirm.com

THE SANFORD FIRM
1910 Pacific Ave. Suite 15400
Dallas, Texas 75201
(214) 717-6653 (telephone)
(214) 919-0113 (fax)

**Haleigh Jones**
Texas Bar No. 24097899
hjones@cwl.law
**Dallas Flick**
Texas Bar No. 24104675
dflick@cwl.law

CRAWFORD, WISHNEW & LANG
PLLC
1700 Pacific Avenue,
Suite 2390
Dallas, Texas 75201
(214) 817-4500 (telephone)
(214) 602-6551 (fax)

*Counsel for Appellants*

## F.R.A.P. 32(G) CERTIFICATE OF COMPLIANCE

In compliance with the Court's Order Granting in Part Appellant's Motion to File its Brief in Excess of Word Count Limit, as well as Federal Rules of Appellate Procedure 28 and 32(g) and Local Rule 5, I hereby certify that this brief contains 19,872 words, excluding the portions of the petition exempted by Rule 94(i)(1).

*/s/ Brian Sanford*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served on all lead counsel of record in accordance with the Federal Rules of Appellate Procedure on November 20, 2024 via PACER's electronic service.

*/s/ Brian Sanford*